# EXHIBIT K

PART 2 OF 2

Nancy DeNardi

1

2      And this was all something I had
3   witnessed before and it was always right before
4   somebody was terminated.

5      Q.    And these were people who the
6   company thought were not performing properly?

7      A.    That's right.

8      Q.    Did anyone ever tell you they
9   thought you weren't performing properly after you
10  got back from your disability leave?

11     A.    No, not until that comment was made
12  and Ginny was, "You seem to be forgetting things.
13  Is chemo affecting your brain?  What's going on?"
14  Other than that, nothing to my face that I
15  recall.

16     Q.    What did she refer to, and I'm
17  saying, referring to Ginny, when she said, "You
18  seem to be forgetting things"?

19     A.    There was a person that I was
20  supposed to call for the American Cancer Society
21  and I had actually called them.  They had left
22  for the day.

23     And Ginny had asked me if it was
24  done.  And I said no, I had left the woman a
25  message on her answering machine.  She hadn't

Nancy DeNardi

1

2    you?

3        A.    I'm sorry?

4        Q.    Wasn't collection work given back

5    to you before you were fired?

6        A.    Not the whole thing.  I believe

7    Regina was doing it at one point and Regina was

8    leaving.  I don't know who else got it after

9    because Regina left a day before I left, so I

10   don't know who got it after that.

11              Ginny had said that she just wanted

12   me to do the end report.  I think Carol was doing

13   everything else, actually, for the collection.

14       Q.    And was collection a critical job

15   responsibility that you had?

16       A.    Collection was a very big job.

17       Q.    Was it critical?

18       A.    I think all the jobs in the billing

19   department are critical.  We were trying to

20   coll

21       Q.    Were you ever given any reason why

22   these job responsibilities were removed from your

23   work?

24       A.    No.  Ginny had told me when I was

25   going onto the Cerner, she said, "Clear your desk

234

Nancy DeNardi

1

2    off by the end of the week, so you could sit with

3    Carol and learn how to do the interface."

4        Q.    So the reason you were given was

5    that you were going to now be doing the Cerner

6    interface?

7        A.    Right.  But like I said, I was

8    under the impression that was only not part time,

9    but until they hired somebody.  So I was starting

10   to wonder what I was going to be doing after they

11   hired somebody for the interface.

12       Q.    So you were under the impression it

13   was a short-term project?

14       A.    Yes, I was.

15       Q.    But Ginny never said that; is that

16   right?

17       A.    She never said it in so many words.

18   That's what it was implied.  It was we're looking

19   to hire somebody, we haven't found anybody yet.

20       Q.    Looking to hire someone to do what?

21       A.    To do the Cerner interface.  They

22   wanted somebody to get in there and do the job

23   and they were looking at Kim DeLong, who did

24   Medicare at that time, but she didn't want to do

25   it, I guess.

235

Nancy DeNardi

1
2          Ginny asked me if I would be
3    willing to take it on until they hired somebody.
4          Q.    Did you ask Ginny what you would be
5    doing after they hired somebody?
6          A.    No, I did not.
7          Q.    Why not?
8          A.    I just assumed wrongly, because my
9    job was gone then, that it would come back to me,
10   but then they hired Shari and everything was
11   divvied up between Jackie, Carol and she.
12         Q.    So when did Ginny tell you that
13   they were looking to hire someone to do the
14   Cerner interface?
15         A.    When I got -- when I took the job,
16   I said I would take it, and she had said that
17   they wanted to hire someone.  I don't know if
18   they ever actually put in an ad or tried to find
19   someone.  She said they were going to look for
20   somebody to do that job, to do it permanently.
21         Q.    So prior to that time, you got your
22   own responsibilities, right?
23         A.    Yes.
24         Q.    Before you were doing the Cerner
25   interface?

Nancy DeNardi

1

2          A.      Yes.

3          Q.      And when did you start doing the

4    Cerner interface, approximately?

5          A.      I don't know.  I think it was

6    approximately just before Shari started.  I was

7    sitting with Carol, I was still doing other

8    things.  I still had some of my responsibilities.

9    When Shari started, everything kind of went.  I

10   was then basically just doing the Cerner.  I

11   don't know the exact date.

12         Q.      Is it your position that Shari

13   basically took over your job?

14         A.      That was my impression, yes.

15         Q.      That was your impression?

16         A.      And that's exactly what I feel.

17         Q.      What were you doing immediately

18   before Shari was hired?

19         A.      The refund checks.

20                 The client bills.

21                 Overseeing -- Ginny at one point

22   wanted me to oversee the hospital data entry,

23   which became Shari's exclusively when Shari

24   started.

25                 I was the backup biller when the

1                    Nancy DeNardi

2                    You'd have to look at my paychecks

3    going back to that time to see how much overtime

4    I put in, but there was quite a bit done, and I

5    never had any complaints about my job from

6    anybody.  I actually got a nice little raise and

7    bonus that year.

8          Q.    Did you ever tell anyone at the

9    company that you had little or no work to do?

10         A.    No.

11         Q.    Is it true?

12         A.    That I had little or no work to do?

13         Q.    Yes.

14         A.    No.

15         Q.    What about when you were doing the

16    Cerner interface, did you have little or no work

17    to do?

18         A.    I had little or no work to do in

19    regards to what I used to have.  I had one job

20    and one job only, which was pretty boring to do

21    the same thing day in and out, day in and day

22    out.

23         Q.    So you weren't happy doing that?

24         A.    No, I wasn't.

25         Q.    But would you say you had no work

266

1                         Nancy DeNardi

2          A.     All right.

3          Q.     How many times did Carol tell you

4    that you weren't getting the job done quickly

5    enough?

6          A.     She said it to me that one time

7    that I remember.  Ginny said it to me after that.

8                 It was basically after that I just

9    kind of just steered clear with Carol.  I didn't

10   want a confrontation.  I didn't want a

11   confrontation with any of them at this point.

12   Like I said before, I wanted to go in, do my job

13   and go home.  I was extremely unhappy.  And I

14   just wanted to be left alone.

15         Q.     Did you report to Carol at that

16   time, meaning did you have to give her your work?

17         A.     I had to give her everything I did

18   for the day at the end of the day, so she could

19   go over it.

20         Q.     How were you able to steer clear of

21   her?

22         A.     It was very difficult.  During the

23   day I just tried to stay in my cubby unless I had

24   a question and I had to ask her.  At the end of

25   the day, I brought over my work and said good

1                        Nancy DeNardi

2                I did the right thing.  I punched

3       her out because she wasn't there.  I wasn't Terry

4       Ann Sweet or Wendy Yelton, who punched somebody

5       in because they weren't there.

6                And I'm sorry, but that is -- this

7       is very upsetting to me and I think it's more

8       upsetting to me that if they wanted to get rid of

9       me, get rid of me.  I truly believed they used my

10      daughter, obviously they had to get rid of her

11      first if they wanted to get rid of me, my

12      daughter didn't do anything to anybody in that

13      company ever.  She went in and did her job.  I

14      went in and did my job.  I did not steal anything

15      from anybody.

16                MR. KLEIN:  Can you read the

17           question back for me, please?

18                (The designated question was read

19           by the court reporter.)

20           Q.    Did you believe that Joe Chiseri

21      had a perception prior to your firing that you

22      were disabled?

23           A.    I didn't have a whole lot of

24      contact with Joe, so I'll be honest and say I

25      don't know what he perceived.

278

1                              Nancy DeNardi

2                    I will say that I know Ginny would

3     have talked to Mark.  I'm sure that she expressed

4     a desire to get rid of me, and I'm sure Mark

5     expressed that same desire to Joe.  I'm sure it

6     was brought up in conversation.  I'm sure they

7     talked about it.

8                    Whatever reason with Joe, I don't

9     know.  I believe that I was let go for a

10    disability that I didn't have.  I think it

11    started with Ginny, it went to Mark, and at that

12    point I would say Joe probably said, "Fine, get

13    rid of her."

14         Q.    Prior to your termination, you

15    didn't have any conversations with Mark Newton

16    about your either perceived disability or

17    sickness, correct?

18         A.    No.

19         Q.    So you don't know for a fact what

20    Ginny told Mark as to why she wanted to fire you

21    if, in fact, she ever told him, right?

22         A.    No, I never heard a conversation

23    between the two of them.

24         Q.    So it's your belief that Ginny

25    wanted to get rid of you because she perceived

279

1                              Nancy DeNardi

2        you to have a disability, right?

3             A.    Yes.

4             Q.    And it's also your belief that she

5        told Mark Newton that she wanted to get rid of

6        you because she perceived you to have a

7        disability; is that right?

8             A.    Yes.

9             Q.    And then you believe that Mark

10       Newton wanted to get rid of you because he agreed

11       with Ginny that you had this disability?

12            A.    Yes.

13            Q.    Or they believed you had a

14       disability, right?

15            A.    Yes.

16            Q.    And you never had a conversation

17       with Mark Newton about having a disability or

18       even a perception of having a disability,

19       correct?

20            A.    Correct.

21            Q.    And the only conversation you had

22       with Mark Newton regarding your termination was

23       the day you were actually terminated, correct?

24            A.    Correct.

25            Q.    So would you agree with me that you

1

2                    A C K N O W L E D G E M E N T

3

4               I, NANCY DeNARDI, hereby certify

5       that I have read the transcript of my

6       testimony taken under oath in my

7       deposition of March 20, 2008; that the

8       transcript is a true, complete and

9       correct record of what was asked,

10      answered and said during this deposition,

11      and that the answers on the record as

12      given by me are true and correct.

13

14      _____

15                    NANCY DeNARDI

16

17      Subscribed and sworn to before me

18      this 14th day of ___May___, 2008.

19

20      _____

21                    NOTARY PUBLIC

22                                          SASWATI CHOUDHURY
                                            Notary Public - State of New York
23                                          NO. 01CH6123122
                                            Qualified in Dutchess County
24                                          My Commission Expires 01/21/09

25

293

1

2

3                          CERTIFICATE

4          I, LINDA P. FABEL, a Notary Public

5    within and for the State of New York, do

6    hereby certify:

7          That NANCY DeNARDI, the witness

8    whose deposition is hereinbefore set

9    forth, was duly sworn by me and that the

10   within transcript is a true record of the

11   testimony given by such witness.

12         I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage and that I am

15   in no way interested in the outcome of

16   this matter.

17         IN WITNESS WHEREOF, I have hereunto

18   set my hand this 31st day of

19   March , 2008.

20

21                        Linda P. Fabel

22                        LINDA P. FABEL

23

24

25

# ERRATA SHEET

**Deposition of Plaintiff Nancy DeNardi taken on March 20, 2008**

Re:    *DeNardi v. DRA Imaging, P.C., et al*, 07 Civ. 5794 (MGC)

| PAGE | LINE(S) | READS | SHOULD READ | REASON FOR CHANGE |
|---|---|---|---|---|
| 67 | 6-7 | "They'll know more we'll all of us be in there together" | "No more will all of us be in there together." | Transaction error |
| 98 | 9 | going to let this defy me. | going to let this define me. | Transcription error |
| 125 | 10 | McCauley as supervisors, and I was listed as billing department lead. | McCauley as supervisors, and I was not listed as billing department lead. | Transcription error |
| 213 | 9 | It was a significant job in their eyes when they gave it to me. | It was not a significant job in their eyes when they gave it to me. | Transcription error |
| 254 | 8 | and not to mention Fishkill was a three-hour | and not to mention Fishkill was a 1/2-hour | Transcription error |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Nancy DeNardi

Sworn to before me this 19/th
day of ~~April~~ 2008

NOTARY PUBLIC

SASWATI CHOUDHURY
Notary Public - State of New York
NO. 01CH6123122
Qualified in Dutchess County
My Commission Expires 8/28/09

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
NANCY DeNARDI,

                    Plaintiff,

        - against -

DRA IMAGING, PC and IMAGING SUPPORT
SERVICES, LLC,

                    Defendants.

------------------------------------X

                    Tuesday, April 22, 2008
                    10:20 a.m.
                    Held at the Offices of
                    Keane & Beane PC
                    445 Hamilton Avenue
                    White Plains, New York


        CONTINUED EXAMINATION BEFORE TRIAL of

            NANCY DeNARDI,

Plaintiff, pursuant to Notice, before Linda P.

Fabel, a Shorthand Reporter and Notary Public

within and for the State of New York.


            Judicial Reporting Service, Inc.
                 (914) 946-0888

1                             Nancy DeNardi

2       Barkiyani?

3              A.      When?

4              Q.      At any time?

5              A.      Was I having problems with her?

6              Q.      Yes.

7              A.      For that statement or just --

8              Q.      No, no, no.

9              A.      Okay.

10             Q.      Not that statement.  She didn't

11      tell you that statement, right?

12             A.      No.

13             Q.      And you never repeated that

14      statement to her?

15             A.      I don't believe I said anything to

16      Ginny.

17             Q.      You were having problems with Ginny

18      Barkiyani, right?

19             A.      I believe so.

20             Q.      You know so, don't you?

21             A.      Yes.

22             Q.      And you were having problems with

23      Carol?

24             A.      Yes.

25             Q.      And you were having problems with

361

Nancy DeNardi

1

2    Jackie?

3         A.    Yes.

4         Q.    And it's fair to say you never went

5    to Mark about the problems you were having with

6    either of those people, correct?

7         A.    Yes.

8         Q.    And you never went to Joe?

9         A.    Yes.

10        Q.    Is it fair to say that the reason

11   you didn't go to Joe was because of the statement

12   Gail Platt made to you in latter 2003?

13        A.    That's fair.

14        Q.    All right.

15        A.    But not just the statement.  What I

16   witnessed with Maureen and with my neighbor, it

17   got them nowhere.

18        Q.    What you witnessed with Maureen was

19   what she was telling you, right?

20        A.    I don't think it was just on what

21   she was telling me.  I think the whole company

22   because -- I mean it was pretty -- it wasn't

23   private what was happening between Maureen and

24   her supervisor.  It was obvious.

25             And then she wasn't an IT anymore.

364

1                        Nancy DeNardi

2        Poughkeepsie.  She was up at Poughkeepsie for, I

3        have to say a month or two.

4            Q.      And where was she located or

5        situated in the company?

6            A.      She sat at the front desk.

7            Q.      And where were you?

8            A.      I was in the billing department.

9            Q.      Not at the front desk?

10           A.      No.

11           Q.      So --

12           A.      But I walked by the front desk a

13       lot during the day and there was always somebody

14       practically on top of her.

15           Q.      And who was the somebody that was

16       on top of her?

17           A.      I believe it was Roxanne Queen

18       (phonetic) that was watching her.

19           Q.      How come you didn't go to Mark with

20       the problems you were having with Jackie and

21       Ginny and Carol?

22           A.      For the same reason I didn't go to

23       Joe.  Mark and Ginny seemed to be pretty close.

24       He was Ginny's immediate supervisor.  I really

25       felt that he would just go back to Ginny and it

365

1                    Nancy DeNardi

2  wouldn't do any good.  It wouldn't have gone

3  anywhere.

4             I felt I would have been just -- I

5  went to Ginny, I got nowhere with Ginny.  I

6  talked to her a few times.

7             Going to Mark, I felt he would have

8  just gone back to Ginny and it would have died

9  right there.

10       Q.    You never gave Mark the chance to

11  address any of the concerns that you had?

12       A.    No, I didn't.

13       Q.    You never gave Mark the chance to

14  address any of the issues that you were having

15  with either your job duties being taken away or

16  you being humiliated, correct?

17       A.    No.

18       Q.    And you believe that Mark would

19  have just backed Ginny --

20       A.    Yes.

21       Q.    -- correct?

22       A.    Yes.

23       Q.    And the basis for your belief is

24  what you heard from other people, right?

25             MS. PERRY:  Object to the form of

Nancy DeNardi

1

2  regard to the Cerner interface?

3           MS. PERRY:  I think you spent a lot

4       of time on this last time.

5           MR. KLEIN:  I've got another

6       question.  It's just a follow-up.  As you

7       see, I'm not getting the answers.  I'm

8       trying to get simple answers here.

9       Q.    What were the functions that you

10  did on the Cerner interface?

11      A.    I ran a report, it dropped all the

12  charges.  I had to go through the report.  If the

13  diagnoses weren't there, I had to give them the

14  codes.  She had to code them.  I had to put them

15  in manually.

16           I had to check all the referring

17  doctors, make sure they were right.

18           Make sure the insurance companies

19  were right.

20           Create a checklist.

21      Q.    Could anyone be billed for services

22  performed by DRA before you completed your daily

23  Cerner interface tasks?

24      A.    No.

25      Q.    Could anyone have been trained to

1                    Nancy DeNardi

2        A.    "Mom."

3        Q.    Did anybody ever complain about the
4    way she talked to you or you talked to her while
5    you were at work?

6        A.    Not that I could recall.  The way
7    she addressed me, no.

8        Q.    Tell me what the punch-in and
9    punch-out system was in 2005.

10        A.    On the computer you would pull up
11    the time sheet, punch in your last four digits of
12    your Social Security number, punch it in again.
13    And it would record the time you punched in; or
14    if you were punching out, the time you punched
15    out.

16        Q.    And there were no time cards in
17    2005, correct?

18        A.    I don't think so.

19        Q.    So it was all done on the computer,
20    as far as you recall?

21        A.    Right.

22        Q.    Was the punch-in system the same
23    for every employee at DRA?

24        A.    No.  Some of the supervisors had
25    what they called a time sheet, which worked on

1                          Nancy DeNardi

2          Q.     Tell me -- take me through the day

3     of May 5th, after you got to work.

4          A.     I got to work, ran the report that

5     had to be run first thing for Cerner.  Started to

6     work on that.

7                 Probably said good morning to

8     Joanie and Candice, like I usually did.

9                 About 8:15, 8:30-ish I was over by

10    Jackie's desk, I was talking to Jackie and Carol

11    and Ginny was there.

12                Left there to go back to do my job,

13    to go back to my desk because we were chatting

14    for a few minutes, stopped by the desk that

15    Heather was working at.

16                It was about 8:45.  She was working

17    at Linda Furlano's desk.  Ginny stopped with me,

18    said good morning to Heather.

19                As we were walking away, Ginny was

20    going off to the right to the storeroom, I was

21    going back to my cubby.  And I had mentioned to

22    her that Heather had a final and couldn't come

23    in, and could she work Tuesday instead.

24                And Ginny got a little nasty about

25    it.  She said, "Absolutely not, she's working

1                      Nancy DeNardi

2   Friday.  There's too many people walking around

3   this place as it is."

4                    And she walked away and it was at

5   that moment I just knew, you know, that this is

6   over.  There's no friendship here anymore,

7   there's no nothing.

8                    So I said, "All right, fine."

9                    I went back to my desk.  As I was

10  going back to my desk, I said, "She won't be in

11  next Friday, she has a final, it's final week."

12                   I went back to my desk -- I'm

13  sorry, before we left Heather's desk, I said,

14  "When do you have to leave for school?"

15                   And she said, "I don't have to

16  leave yet.  I still have some time.  I'll go in a

17  little while."

18                   She was going to meet a study group

19  because she had finals next week.

20                   I said, "Okay, fine."

21                   She said she was coming back around

22  noontime to finish out the day.  She was going to

23  work like 12:00 to 4:00.

24                   I went back to my desk, was working

25  at my desk.  I was talking to Joanie for a second

1                    Nancy DeNardi

2    and Heather called.  She said she had left, she

3    had forgot to punch out.  Could I punch her out.

4                    I said fine.  It was about 9:10,

5    9:15.

6                    I went to punch her out.  I went to

7    ask Ginny a question.  She was at her desk, she

8    was putting on her coat.  And then she sat down

9    and she pulled up her computer. She was looking

10   at something and she started rapid firing

11   questions at me, and with each question she got

12   louder and yelling, "Where's Heather?  What time

13   did she leave?  I know she's not here.  Where is

14   she?  What did she do?"

15                   And she was so quick with

16   questions, I was like, "What are you talking

17   about?"

18                   Finally when she came up for a

19   breath, she said, "Did you punch Heather out?"

20                   I said, "Yeah, what's the big

21   deal?"

22                   And with that, she got up and, like

23   I said, she had her coat on, she was leaving for

24   the day.  She said, "I know Heather's not happy

25   here.  Maybe she should look for a job somewhere

                         Nancy DeNardi

2     else."

3                    And I got angry and I said.

4     "Heather's very happy here, but if that's what

5     you want, I'll tell her not to come back."

6                    And I came back in, "Is that what

7     you want for me also?  Do you want me to look for

8     a job elsewhere?"

9                    And she said, "Absolutely not."

10                   And I said "Fine," and I walked

11    away.

12                   And I didn't see her for the rest

13    of the day.  She had left for the day with Mark

14    and Sandy, because Sandy was waiting outside her

15    office, waiting for her.

16                   And I believe I stayed in my cubby

17    the rest of the day and did my job and went home.

18    Q.       Was that the only conversation you

19    had with Ginny about your daughter?

20    A.       That day, yes, she had left for the

21    day, yes, she wasn't there the rest of the day.

22                   And when I came in on Monday I

23    wanted to speak to her.  She stayed in her office

24    all day with her door closed.

25                   At one point her sister was in

1                          Nancy DeNardi

2          A.      No.

3          Q.      Isn't that what Mark told you on

4    Monday, May 8th, that you had told Ginny that you

5    didn't punch Heather out?

6          A.      I don't remember that.

7          Q.      Didn't Mark accuse you of lying to

8    Ginny on May 8th?

9          A.      I'm trying to remember the whole

10   conversation.  I don't remember that.

11              I remember telling Mark that Lisa

12   had also punched somebody else out.  I remember

13   we talked about not punching out for chemo.

14              I don't remember him saying that I

15   lied to Ginny.  I didn't lie to anybody.

16         Q.      Well, didn't you tell people that

17   one of the reasons why you were being fired is

18   because you lied to Ginny?

19         A.      I didn't say that to anybody.

20         Q.      You never told anyone that?

21         A.      Not that I recall.

22         Q.      Did you ever put it in writing?

23         A.      Not that I recall.

24         Q.      Is there anything that could help

25   refresh your recollection?

409

Nancy DeNardi

1

2    Q.    Is that the first time you ever

3  heard of it?

4          MS. PERRY:  You're talking about

5      the e-mail?

6          MR. KLEIN:  Seen it in writing.

7    Q.    Have you ever seen it in writing

8  other than that e-mail?

9          MS. PERRY:  Where they're accusing

10      her of lying and stealing?

11          MR. KLEIN:  Correct.

12    Q.    And had you ever heard anyone

13  say --

14    A.    I'm sorry, I'm -- I would have to

15  look at the little paragraph that Ginny wrote up

16  for the Labor Board.  It might have been in

17  there, it might have been there.

18    Q.    And other than reading it, you had

19  never heard it anywhere?

20    A.    I don't believe so.

21    Q.    Never heard it from Ginny?

22    A.    I don't believe so.

23    Q.    Never heard it from Mark?

24    A.    I don't believe so.

25    Q.    Well, do you remember everything

Nancy DeNardi

1

2    that took place in that conversation on May 8th?

3        A.    I would like to think I did, but

4    I'm sure I didn't, my head was spinning, I could

5    not believe what was happening.

6        Q.    What time did that conversation

7    start?

8        A.    On the 8th?

9        Q.    Yes.

10       A.    About a quarter to 4:00, about 10

11   to 4:00.

12       Q.    What time did it end?

13       A.    It ended fairly quickly because I

14   believe I was out of there before 4:00 o'clock.

15       Q.    What time did it end?

16       A.    Probably about 5 minutes after it

17   started.

18       Q.    So it started either at a quarter

19   to 4:00 or 10 to 4:00 and it ended?

20       A.    Before 4:00.

21       Q.    Before 4:00?

22       A.    I didn't want to hang around.  I

23   wanted to get out of there as quickly as

24   possible.  I didn't see much reason to hang

25   around.

411

1                           Nancy DeNardi

2          Q.      During the meeting on May 8th, did

3   anyone accuse you of stealing?

4          A.      I don't know if he used those

5   words.

6          Q.      What words did he use?

7          A.      Punching my daughter out.  It was

8   an inference that I waited until an hour or so

9   after she left to punch her out.

10                 I don't know if Mark said it in so

11  many words.  I got the impression that he felt

12  that maybe I did it so she'd get more money.

13                 I know I said to him, "Why would I

14  do that?  Why would I risk my job to give her 2

15  or 3 dollars extra in her paycheck?  It was the

16  most ridiculous thing I have heard.  She was

17  coming back at noontime.  I punched her out so

18  she wouldn't get paid."

19                 If I hadn't punched her out, they

20  would have paid her until 4:00 o'clock in the

21  afternoon.  I said, "I punched her out because I

22  thought it was the right thing to do as an

23  employee, so she would not get paid any further."

24         Q.      Mark never accused you of stealing,

25  though; isn't that right?  That was what you

Nancy DeNardi

1   inferred he was saying?

2       A.      He never used the words.  I -- I --

3   it's the only thing I could think of, what would

4   the reason be to punch her out later.

5       Q.      That was, again, your inference --

6       A.      Yes.

7       Q.      -- correct?

8       A.      Yes.

9       Q.      Do you recall the exact words that

10  Mark used during that conversation?

11      A.      Only parts of it.  Like I said, my

12  head was spinning.  I remember talking to him

13  about Lisa punching somebody out the same day.

14          He said they were going to make an

15  example out of me.

16          He said, "I understand there's also

17  a problem with you not punching out for chemo."

18          I told him that was Ginny's idea to

19  take reports with me.  I could take work while I

20  was sitting there.

21          At that point I turned to Ginny.  I

22  asked her for help.  I said, "Please help me out

23  here.  You know, I don't understand what's going

24  on."

413

                              Nancy DeNardi

1

2              And that's when she turned to me

3    and said, "The decision's been made."

4              And at that point I said -- I knew

5    there was nothing -- I asked -- I said, you know,

6    "What about a second chance?  Why aren't we just

7    talking about what happened, and don't do it

8    again?"

9              And I was told, "Absolutely not."

10              And at that point I knew I was up

11    against a wall and I said, "Fine," and I got up

12    and I ran out of there.

13              At that point I wanted out of that

14    building as fast as I could.  Trying to get out

15    without people coming up and saying, "What

16    happened?  What's going on?"

17              As it was, two or three people

18    stopped me on my way out.  I just wanted to get

19    out of there.

20         Q.    Ginny said, "The decision's been

21    made," correct?

22         A.    Yes.

23         Q.    Is that the only thing she said?

24         A.    That's the only thing she said

25    during that whole meeting.

1                              Nancy DeNardi

2          Q.     "6:30 to 8:00, worked on refunds,"

3    why is that significant, if at all?

4          A.     It's not significant.  It was just

5    one of my jobs that I was doing before it was

6    taken away.  I did refund checks.

7          Q.     Was it given back to you, the

8    refunds?

9          A.     Not after I started Cerner.

10         Q.     And 8:30 to 9:30, you did front

11   desk?

12         A.     Yes.

13         Q.     And then the rest of the day you

14   did a credit balance report?

15         A.     That was the collection report.

16         Q.     Is that part of Cerner?

17         A.     No.

18         Q.     Can you read slowly, please, the

19   entry for Wednesday, March 29th, slowly?

20         A.     Okay.

21         Q.     Thank you.

22         A.     "6:30 to 8:00, checked Carol's

23   no's.  Went over IOC cases.

24                "8:00 to 9:00, front desk.  Spent

25   rest of day with Carol.  Spoke to Ginny.  Did not

Nancy DeNardi

1   realize how memo read, said my level has not

2   changed, only thing changed is me doing DRA

3   charges."

4

5       Q.      When did the conversation with

6   Ginny take place regarding your level changing or

7   not changing?

8       A.      I believe it was sometime in the

9   afternoon.  I don't know exactly.

10      Q.      And is that an accurate statement

11  of what Ginny told you, that your level did not

12  change?

13      A.      She said nothing has changed.

14              And I asked her, "Where does it say

15  billing department lead?"  And as I stated

16  before, that was -- she never answered that

17  question.  On three different occasions I asked

18  her that same question and it was never answered.

19      Q.      The memo you're referring to in

20  that entry, did it come out on March 29th?

21      A.      No, it did not.  It came out before

22  that.

23      Q.      How long before that?

24      A.      It came out the same time the memo

25  came out that Shari McCauley was hired as her

Nancy DeNardi

1

2   assistant.

3       Q.      That was sometime in March?

4       A.      Yes.  I don't know whether it was

5   the 14th or 24th, somewhere around there.

6       Q.      Were you doing DRA charges, as you

7   wrote in this entry?

8       A.      Carol was -- yes, Carol was still

9   training me to a point.  I was a lot on my own at

10  that point, but I was still going back to Carol.

11      Q.      Can you read the entry for

12  Thursday, March 30th, please?

13      A.      "6:30 to 8:00, to refund Carol's

14  no's.

15              "8:00 to 9:00, front desk rest of

16  day training Shari."

17      Q.      Is this the first day you were

18  training Shari?

19      A.      I don't recall.  It's the first

20  time I wrote it, but like I said, I did not write

21  everything, so I don't know.

22      Q.      Read Friday, the 31st, please.

23      A.      "6:30 to 8:00, refund Carol's

24  no's."

25      Q.      What did you do for the rest of the

556

1

2           A C K N O W L E D G E M E N T

3

4                I, NANCY DeNARDI, hereby certify

5           that I have read the transcript of my

6           testimony taken under oath in my

7           deposition of April 22, 2008; that the

8           transcript is a true, complete and

9           correct record of what was asked,

10          answered and said during this deposition,

11          and that the answers on the record as

12          given by me are true and correct.

13

14          _____

15                   NANCY DeNARDI

16

17     Subscribed and sworn to before me

18     this 17 day of June _____ , 2008.

19

20     _____

21          NOTARY PUBLIC

22                    DAVIDA S. PERRY
                Notary Public, State of New York
23                      No. 4987676
                Qualified in Westchester County
24          Commission Expires Oct. 21, 20__

25

            Judicial Reporting Service, Inc.
                   (914) 946-0888

559

1

2

3                        CERTIFICATE

4              I, LINDA P. FABEL, a Notary Public

5      within and for the State of New York, do

6      hereby certify:

7              That NANCY DeNARDI, the witness

8      whose deposition is hereinbefore set

9      forth, was duly resworn by me and that the

10     within transcript is a true record of the

11     testimony given by such witness.

12             I further certify that I am not

13     related to any of the parties to this

14     action by blood or marriage and that I am

15     in no way interested in the outcome of

16     this matter.

17             IN WITNESS WHEREOF, I have hereunto

18     set my hand this 30ᵗʰ ____ day of

19     _April_____ , 2008.

20

21                        _Linda P. Fabel_____

22                        LINDA P. FABEL

23

24

25


                Judicial Reporting Service, Inc.
                      (914) 946-0888

## ERRATA SHEET

Deposition of Plaintiff Nancy DeNardi taken on April 22, 2008

Re:    *DeNardi v. DRA Imaging, P.C., et al,* 07 Civ. 5794 (MGC)

| PAGE | LINE(S) | READS | SHOULD READ | REASON FOR CHANGE |
|------|---------|-------|-------------|-------------------|
| 299 | 7 | "conversation" | "opportunity" | Transaction error |
| 328 | 12 | "Ginny -- and I wasn't there right after Ginny spoke about Heather. Actually, she was leaving with Mark." | Ginny wasn't there. Right after Ginny and I spoke about Heather she was leaving with Mark." | Transcription error |
| 339 | 4 | "I wasn't"... | "I was"... | Transcription error |
| 213 | 9 | It was a significant job in their eyes when they gave it to me. | It was not a significant job in their eyes when they gave it to me. | Transcription error |
| 254 | 8 | and not to mention Fishkill was a three-hour | and not to mention Fishkill was a 1/2-hour | Transcription error |
| 373 | 13-14 | "diagnoses weren't there, I had to give them the coder. She had to code them." | "diagnoses weren't there, I had to give them to the coder so she could code them." | Transcription error |
| 387 | 17 | "was told not to do any other work." | "was told not to do any overtime." | Transcription error |
| 463 | 24 | "Saturday with Carol for interface," | "sat with Carol for interface," | Transcription error |
| 465 | 20 | "CBT" | "CPT" | Transcription error |
| 491 | 18 | "claims where Carol was prime." | "claims where Medicare was prime." | Transcription error |
| 496 | 24 | "half-hour often..." | "half-hour off..." | Transcription error |
| 513 | 16 | "remember the statistics" | "remember the specifics" | Transcription error |

| 514 | 5-7 | "--I was saying I had MVP and MVP didn't care that it was what was called a genetical behavioral health." | "I was saying I had MVP and the therapists I was calling didn't accept MVP. It turned out I was supposed to use United Behavioral Health." | Transcription error |
|-----|-----|-----|-----|-----|
| 514 | 13 | "And I ended up writing the number…" | "And I ended up calling the number…" | Transcription error |
| 532 | 14 | "$20,000 is nothing a year to work…" | "$20,000 is nothing a year to live…" | Transcription error |

*Nancy DeNardi*

Nancy DeNardi

Sworn to before me this ⌐7
day of June 2008

NOTARY PUBLIC