# EXHIBIT M

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------x

NANCY DENARDI,                          :

                     Plaintiff, : Docket No.

          -against-              : 07CIV5794

DRA IMAGING, P.C. and            :    (MGC)

IMAGING SUPPORT SERVICES, LLC,   :

                     Defendants. :

---------------------------------x

                     June 20, 2008

                     10:00 a.m.


     Deposition of Defendants, by **MARK NEWTON**,

held at the offices of Keane & Beane, P.C.,

445 Hamilton Avenue, White Plains, New York,

before a Notary Public within and for the

State of New York.

1                          M. Newton

2      questions today?

3          A.      No.

4          Q.      Are you ready to begin?

5          A.      Yes.

6          Q.      When did you commence your employment

7      with DRA?  Again, I am going to be referring to

8      both defendants collectively as DRA today, just

9      to make it easier.

10         A.      July 2000.

11         Q.      In what capacity?

12         A.      Chief financial officer.

13         Q.      Was anybody else hired at the time

14     that you came on board in a senior position, if

15     you know?

16         A.      Joe Chiseri was hired in June of 2000.

17         Q.      And into what position?

18         A.      Chief administrative officer.

19         Q.      Did you know Mr. Chiseri before you

20     began to work at DRA?

21         A.      Yes.

22         Q.      How did you know him?

23         A.      I met him at the City of Poughkeepsie,

24     where he was the City either administrator or

25     manager and I was the chief financial officer,

1                        M. Newton

2      that she should develop supervisory level

3      people in the department that would oversee

4      either people or functions and not have

5      everyone reporting directly to her, but have

6      them reporting up through those people and have

7      those people report to her.  It would allow her

8      to have more perspective in terms of give her a

9      chance to take a step back.

10                     And one of the persons that, over

11     time, Gail felt was an appropriate person to

12     elevate into that level was Nancy.  And it's my

13     recollection that it was Gail who made Nancy

14     the billing department lead as opposed to the

15     billing insurance lead.

16         Q.     So are you saying that it is your

17     recollection that there were two promotions:

18     An insurance rep lead promotion and one to

19     billing department lead promotion?

20         A.     I don't remember -- I don't remember

21     when Nancy was made the insurance department

22     lead, but I do recall her being elevated to or

23     asked to function as a department-wide lead for

24     Gail.

25         Q.     Would that be sort of Gail's

1                          M. Newton

2        A.      Correct.

3        Q.      What was the status of the Cerner

4    project as of the date you wrote this E-mail?

5        A.      Ultimately, we went live in the

6    middle of November of '05, and my recollection

7    is we probably, as of the end of October of

8    '05, had identified that we would go live by

9    the middle of November.

10               So, everybody involved with

11   achieving that goal was working very hard and

12   there was lots of pressure to achieve the goal.

13       Q.      Did you have any responsibilities of

14   getting Cerner up and running?

15       A.      No.

16       Q.      Were you overseeing any aspect of

17   the project, the October 27, 2005 time frame?

18       A.      I was overseeing Ginni and her

19   people, but they were involved day to day.   In

20   just an administrative capacity was I

21   overseeing that.

22       Q.      But you were involved in the

23   decision to purchase Cerner?

24       A.      Yes.

25       Q.      When was that decision made?

1                          M. Newton

2          A.      It was made over the course of many

3    months, that culminated in the decision to

4    purchase the software in June of '03.

5          Q.      How was it paid for?  Was it paid

6    for over time, was it paid for up front or

7    something else?

8                          MR. KLEIN:  Objection to the form.

9                          You can answer.

10          A.      Well, Cerner is the purchase --

11    Cerner is a company that sells software

12    applications for healthcare providers.  Our

13    agreement with Cerner was to make payments over

14    time as the project reached certain milestones,

15    and DRA paid for those payments both out of

16    cash and its own financing.

17          Q.      Was there ever a point in time where

18    you thought that you wouldn't be able to

19    integrate Cerner into the existing system at

20    DRA?

21          A.      Yes.

22                          Originally, Cerner was purchased to

23    be both -- all three of the main types of

24    computer systems that a radiology practice

25    uses:  The front end, which is the system that

1                         M. Newton

2    tracks the patients as they schedule their

3    appointments, come in through the front door,

4    are seen by the technologists, have the exam

5    performed.  It then goes to the transcriptionist

6    or the reading room, to the physician and then

7    to the transcriptionist.  That's what we would

8    call the front end.

9                Of the second of the three is what

10   we would call the PAX, which is the computer

11   system that holds the digital images and

12   archives them for future references.  And then

13   the third part of it would be the billing and

14   the collecting of the payment system or what we

15   may have called the back-end system.

16                Originally, the agreement with

17   Cerner was to provide all three and replace the

18   existing systems that we had.  We were looking

19   for one integrated solution that could do

20   everything.

21                Somewhere around the time that Ginni

22   took over for Gail, maybe just a little after

23   that, it became apparent that the -- that

24   Cerner's billing system was not acceptable to

25   us.  It wouldn't be able to perform what we

1                        M. Newton

2    needed it to perform, the way we needed it to

3    perform, and so we made a decision to not

4    accept the billing part of the system and,

5    instead, to integrate it in -- integrate Cerner

6    into our existing billing system.

7         Q.    Which was Vital Works?

8         A.    Correct.

9         Q.    And did that require additional work

10   from people in the billing department?

11        A.    It required different work.  I mean,

12   ultimately I think that it required less work

13   because if we had accepted the Cerner system,

14   it would have worked so poorly that it would

15   have been bad for DRA.

16             So, instead of learning how to use

17   the new system, we had to work at creating the

18   interface from the new system to the existing

19   system.

20        Q.    Who created the interface?

21        A.    Cerner programmers and vital works

22   programmers and our in-house IT department

23   created the mechanical interface where data was

24   exchanged.

25        Q.    Was it sort of a custom-made system

M. Newton

1

2    at that point?

3        A.    Yes.

4        Q.    Did you have to pay additional

5    moneys in order to create this kind of

6    custom-made plan?

7        A.    We did.

8        Q.    Mrs. Barkyani testified at her

9    deposition on Tuesday that some time around the

10   holidays of 2005, when Mrs. DeNardi had

11   returned from her disability, that they had a

12   conversation in which Mrs. DeNardi agreed to

13   take over the handling of the Cerner interface.

14   Do you remember that testimony?

15       A.    Yes.

16       Q.    You were not present during that

17   conversation; were you?

18       A.    I don't think so, no.

19       Q.    And were you aware, before the

20   alleged meeting took place, that Mrs. Barkyani

21   was going to approach Mrs. DeNardi to discuss

22   her taking over Cerner?

23       A.    I don't recall that I was, but Ginni

24   may have mentioned to me she was going to ask

25   Mrs. DeNardi to do it.

1                          M. Newton

2          Q.     Do you know what work she was

3     performing on May 5th?

4          A.     No.

5          Q.     How did Heather DeNardi account for

6     her time?

7          A.     I don't know.

8          Q.     Do you know whether or not the

9     employees in the billing department accounted

10    for their time in any particular way?

11         A.     I know that the employees for DRA

12    accounted for their time -- including the

13    billing department -- accounted for their time

14    by using either E-Time or E-Time Clock or

15    E-Timecard.

16         Q.     Is that a software program?

17         A.     Correct.

18         Q.     When you started working at DRA in

19    July of 2000, was the system that was in place

20    one that was on the computer?

21         A.     No.  When I started, it was the

22    traditional timecard with the -- with all the

23    slots on the wall and the clock and employees

24    who were required to punch the clock, punched

25    the clock with their card.

1                                    M. Newton

2        Q.        And when did it transition over to

3    the system on the computer?

4        A.        After I began, so I would estimate

5    2001, 2002.

6        Q.        Was Mrs. Barkyani required to

7    account for her time, as well?

8        A.        Yes, using E-Timecard.

9        Q.        Her system was different than the

10   other employees in the billing department?

11       A.        Some employees used E-Time Clock and

12   some used E-Timecard.

13       Q.        And how was it determined which

14   system each employee would use --

15       A.        Pretty much the ones who were

16   punching the clock used E-Time Clock and the

17   ones who were manually filling out a timecard

18   used E-Timecard.

19       Q.        How was that system determined?

20       A.        I don't know.  That was in place

21   when I got there.

22       Q.        Did you ever ask anybody why do some

23   people do it manually and why do some people --

24       A.        It was evident to me that people on

25   a more professional level didn't punch the

1                          M. Newton

2          A.      Yes.

3          Q.      And when did your next contact with

4   Mrs. Barkyani occur with regard to Heather

5   DeNardi?

6          A.      Later in the morning.

7          Q.      When, in relationship to that

8   two-minute conversation that you had?

9          A.      Afterwards.

10         Q.      About how long afterwards?

11         A.      Hour, two hours.

12         Q.      After the first initial two-minute

13  conversation, did you take any steps to try to

14  locate Mrs. DeNardi?

15         A.      No.

16         Q.      Did you go over to Mrs. DeNardi and

17  ask her, Ginni seems very concerned about

18  Heather.  Where is she?

19         A.      No.

20         Q.      And what happened during the second

21  conversation that you had, which you said was

22  about an hour later?

23         A.      Ginni came over to say that at some

24  point, Heather had left; that she had then had

25  a conversation with Mrs. DeNardi where Ginni

1                            M. Newton

2      asked Mrs. DeNardi if she had punched out

3      Heather and Mrs. DeNardi initially said no.

4                    Ginni, from computer records, believed

5      that she had, and asked Mrs. DeNardi again,

6      "Did you punch Heather out?"  And at some point,

7      Mrs. DeNardi said, "I did."  So, Ginni came

8      over to say that she was upset that Mrs. DeNardi

9      had lied to her and hadn't told her the truth

10     until she was either confronted with or

11     believed that Ginni had the documentation to

12     indicate that she had punched Heather out.

13                    So then Ginni and I talked about what

14     to do as a result of that occurrence and we

15     talked about termination, because we didn't

16     think we could trust Mrs. DeNardi anymore and

17     we decided to sleep on it over the weekend and

18     decide on Monday morning.

19         Q.     Up until that point, had Ginni

20     Barkyani ever indicated to you that she felt

21     she couldn't trust Nancy DeNardi?

22         A.     I don't think so.

23         Q.     In fact, up until that point, it was

24     your understanding that Mrs. Barkyani

25     considered Nancy DeNardi a key employee;

85

M. Newton

1

2      correct?

3          A.      Yes.  And I did, too.

4          Q.      And the Cerner project was a

5      significant project for DRA?

6          A.      Uh-hmm.

7          Q.      A lot of --

8                  MR. KLEIN:  Yes?

9          A.      Yes.

10         Q.      A lot of money had been invested in

11     the project?

12         A.      Yes.

13         Q.      And you wanted it to succeed in

14     whatever way it could?

15         A.      Yes.

16         Q.      And that was a project that you

17     became or the interface portion of the project

18     had been assigned to Mrs. DeNardi at a given

19     point in time?

20         A.      Yes.

21         Q.      And that was an important project?

22         A.      Yes.

23         Q.      Did the timecard that Mrs. Barkyani

24     said she had seen regarding Heather being

25     punched out, did the timecard itself indicate

1                           M. Newton

2        Q.      Other than terminating somebody's

3   employment for any type of misconduct, there

4   are a variety of disciplinary actions that can

5   be taken against an employee who has done

6   something that the company feels is wrong;

7   correct?

8        A.      Correct.

9        Q.      They can be suspended; that's an

10  option?

11       A.      Correct.

12       Q.      As Mrs. Yolton was; correct?

13       A.      Yes.

14       Q.      Did you ever discuss Mrs. Barkyani

15  suspending Mrs. DeNardi without pay for

16  allegedly lying?

17       A.      No.

18       Q.      And it's your testimony that

19  Mrs. Barkyani told you that she lied about

20  punching her daughter's timecard?  Is that your

21  understanding of what the lie was?

22               MR. KLEIN:  Objection to the form.

23               You can answer.

24       A.      My understanding is that

25  Mrs. DeNardi lied to Mrs. Barkyani about

94

M. Newton

1
2    clocking out or punching out her daughter,
3    Heather.
4         Q.    And did you ever testify under oath
5    that Mrs. DeNardi was fired for punching her
6    daughter out at a time when her daughter was
7    still at DRA?
8         A.    No.
9         Q.    Do you remember giving that sort of
10   testimony during the unemployment hearing?
11        A.    No.
12        Q.    Did you take any steps at all on May
13   5th to verify what Mrs. Barkyani was telling
14   you about Mrs. DeNardi lying to her?
15        A.    No.
16        Q.    Did you speak to Heather DeNardi at
17   all on May 5th?
18        A.    No.
19        Q.    Did you speak to Mrs. DeNardi at any
20   point in time on May 5th?
21        A.    I may have, but not -- I don't
22   recall speaking to her about this incident on
23   May 5th.
24        Q.    Did you attempt to speak to
25   Mrs. DeNardi over the weekend, May 6th and May

1                          M. Newton

2    concerned or angry or annoyed, whatever your

3    words are, about looking for Heather and

4    Mrs. DeNardi allegedly lying?

5        A.    No.

6        Q.    You just accepted what Mrs. Barkyani

7    said without thinking about anything else?

8              MR. KLEIN:  Objection to the form.

9        A.    Yes.

10        Q.    When did you next speak to

11    Mrs. Barkyani again about Nancy DeNardi?

12        A.    Some time Monday morning.

13        Q.    Did you speak to her at all over the

14    weekend about it?

15        A.    No.

16        Q.    Did Mrs. Barkyani require your

17    approval or authorization in order to terminate

18    an employee?

19        A.    It would depend on the employee.

20        Q.    Can you explain when you say that,

21    "It would depend on the employee," what do you

22    mean by that?

23        A.    If it was a part-time employee like

24    Heather, no, she wouldn't.  If it was a

25    full-time employee like Nancy, she would.

M. Newton

1

2      Q.      At any point during either of the

3  two conversations that you had with her on May

4  5th, did Mrs. Barkyani discuss with you

5  terminating Heather DeNardi's employment?

6      A.      I think so, yes.

7      Q.      Was it during both of the

8  conversations or during either one of them?

9      A.      I think it was the latter one.

10      Q.      What did she say about Heather

11  DeNardi's employment?

12      A.      I don't know, other than I think she

13  said she terminated Heather or was going to

14  communicate to Nancy about Heather.

15      Q.      Do you know whether or not she spoke

16  to Nancy DeNardi about the termination of her

17  employment?

18      A.      I don't know.

19      Q.      Did you ask her?

20      A.      I don't remember.

21      Q.      What occurred Monday morning, May

22  8th, with regard to you speaking to

23  Mrs. Barkyani about Nancy DeNardi's employment?

24      A.      We met to discuss what had happened

25  on Friday and to see how we felt about it,

1                          M. Newton

2    given the passage of a couple of days.

3              Again, I know Ginni was annoyed with

4    having to look for Heather and then -- she was

5    angry that Nancy had lied to her.  I was

6    disappointed that Nancy had lied to Ginni and,

7    because of Nancy's important responsibilities,

8    concerned that I could no longer trust her,

9    which was the reason to consider termination.

10             And, so, Monday morning we discussed

11   to see if we felt any differently, having slept

12   on it over the weekend, and I still felt like I

13   wanted to terminate her because I no longer

14   trusted her, and Ginni felt the same way.

15        Q.    In your view, was it -- if this lie

16   had occurred, which you apparently believe that

17   it did, did you feel that it was a very, very,

18   serious lie? First she said she didn't punch

19   her daughter out and then she confessed to

20   punching her out.  Was that a very, very

21   significant lie, in your view?

22             MR. KLEIN:  Objection to the form.

23        A.    Yes.

24        Q.    Was anybody at DRA going to be

25   suffering any sort of damage as a result of

M. Newton

1

2    to an end?

3        A.    I don't remember.

4        Q.    Were you at all involved in her

5    departure from DRA?

6        A.    I don't think so.

7        Q.    Did her name come up at all during

8    the meeting that you had with Mrs. DeNardi on

9    May 8th?

10       A.    I don't think so.

11       Q.    Mrs. DeNardi didn't mention her name?

12       A.    I don't think so.

13       Q.    Did you make any notes of the meeting

14   on May 8th?

15       A.    I asked Ginni to.

16       Q.    And do you know whether or not Ginni

17   did?

18       A.    I believe she did.

19       Q.    I'm referring to contemporaneous

20   notes. Not anything that may have been written

21   after the meeting concluded.  I'm talking about

22   while it was going on.

23       A.    No, it was after the meeting

24   concluded.

25       Q.    Who was present during the meeting?

1                          M. Newton

2        A.    On May 8th?

3        Q.    Correct.

4        A.    When Nancy was terminated?

5        Q.    Correct.

6        A.    It was myself, Ginni and Nancy.

7        Q.    There was nobody else in the room?

8        A.    There was not.

9        Q.    How long did the meeting take?

10       A.    Five minutes.

11       Q.    About what time of day did it occur?

12       A.    Around four o'clock.

13       Q.    Was there anything else that

14   Mrs. DeNardi did, in your mind on May 8th, that

15   caused her to become untrustworthy?

16       A.    No.

17       Q.    It was just strictly lying about

18   punching her daughter out and then ultimately

19   telling the truth?

20       A.    What was strictly about her lying?

21       Q.    What caused her to become

22   untrustworthy, in your view.

23       A.    Yes, it was that she lied to her

24   supervisor about punching her daughter out.

25       Q.    And you were not present when the

115

1                    M. Newton

2              MS. PERRY:  I don't have anything

3        further.

4                  Thank you very much.

5              MR. KLEIN:  Thanks.

6              (Time noted:  12:35 p.m.)

7

8          _____

9            Mark Newton

10

11   Subscribed and sworn to before me

12   this ___ day of _____, 2008.

13

14   _____

15   Notary Public

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK        )

5                             :  ss.

6    COUNTY OF NEW YORK       )

7

8                I, ERIC ALLEN, a Notary Public

9    within and for the State of New York, do

10   hereby certify:

11               That MARK NEWTON, the witness

12   whose deposition is hereinbefore set forth,

13   was duly sworn by me and that such

14   deposition is a true record of the

15   testimony given by the witness.

16               I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, and that I am

19   in no way interested in the outcome of this

20   matter.

21               IN WITNESS WHEREOF, I have hereunto

22   set my hand this 2nd day of July, 2008.

23

24   _____

25                ERIC ALLEN