# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

NANCY DENARDI,                                      Docket No.:

        *Plaintiff,*                              **PLAINTIFF HEREBY**
                                                    **DEMANDS A TRIAL BY JURY**

    -against-

DRA IMAGING, P.C. and
IMAGING SUPPORT SERVICES, LLC

        *Defendants.*
-------------------------------------------------------------------X

COMPLAINT

*[stamp:* RECEIVED JUN 19 2007 U.S.D.C. S.D.N.Y. CASHIERS*]*

      Plaintiff, Nancy DeNardi, as and for her Verified Complaint, all upon information and belief, respectfully alleges as follows:

## JURISDICTION AND VENUE

      1.    This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C § 1331, in that certain of the Plaintiff's claim arise under the laws of the United States and namely Title I of the American with Disabilities Act of 1990 and also under the New York State Human Rights Law and supplemental jurisdiction over the remainder of Plaintiff's claims exists in this action, pursuant to U.S.C § 1367.

      2.    Venue is proper under 42 U.S.C § 2000e-5f and 28 U.S.C § 1391 because both the Plaintiff and Defendants reside within the Southern District of New York and the discriminatory acts complained of took part wholly within the Southern District of New York.

      3.    DeNardi filed a charge of discrimination with the Equal Employment Opportunity Commission and on May 17, 2007, DeNardi received a Notice of Right to Sue.

## IDENTITY OF PARTIES

4.      Plaintiff Nancy DeNardi ("DeNardi") was employed by DRA Imaging, P.C. and/or Imaging Support Services, LLC (collectively referred to as "DRA") for seven years, from September 7, 1999 until she was unlawfully terminated on May 8, 2006.

5.      Defendant DRA is a corporation duly organized and existing under the laws of the State of New York and is licensed to and maintains its principal place of business in the County of Dutchess and State of New York.

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

6.      On September 7, 1999, DeNardi commenced her employment with DRA as an Insurance Representative.

7.      From 1999, when DeNardi commenced her employment with DRA, until she was diagnosed with colon cancer in 2005 and terminated thereafter in 2006, DeNardi's value to DRA was recognized and confirmed by the promotions, salary increases, bonuses and the increased duties and responsibilities assigned to her.

8.      Given her demonstrated capabilities, DeNardi was promoted a number of times during her employment, from Insurance Representative, to Insurance Rep. Lead, to Billing Department Lead, and with each promotion DeNardi was given increased responsibilities, including supervising and assisting in all aspects of the Billing Department.

2

9.    During her career with DRA until her colon cancer diagnosis in October 2005, DRA would often call upon DeNardi to handle assignments of considerable significance, such as taking over Medicare, the biggest account in the company.

10.    Further confirmation of DeNardi's positive job performance throughout her tenure at DRA, is described by the following comments made in her performance evaluations:

- "Nancy has grown with this position. She is liked by her co-workers and I have heard from patients that she is very helpful."

- "Nancy has a good perspective on job requirements; she can deal with stress very well."

- "Nancy produces excellent work, she is someone I can depend on to get the job done. She is receptive to suggestions and constructive criticism."

- "She is a great asset to the billing dept and a pleasure to work with."

- "Readily adapts to organizational change, is flexible in handling a variety of unfamiliar operations."

- "Treats co-workers with unfailing courtesy and professionalism."

11.    In Mid-October 2005, DeNardi was diagnosed with colon cancer, and underwent surgery on October 20, 2005.

12.    DeNardi was released from the hospital on October 28, 2005 after a two week stay, where she recovered from surgery for a brief period of time.

3

13.    On December 5, 2005, DeNardi returned to work full-time and without any limitations and received chemotherapy every two weeks starting from November 2005 and lasting until April 18, 2006.

14.    Other than for DeNardi's initial surgery and medical treatment, DeNardi was not limited in the fulfillment of her job duties nor was her ability to function adversely affected.

15.    Although DeNardi had to undergo chemotherapy once she returned to work, for relapse prevention, she worked during the chemotherapy treatment and was able to perform her job duties as she always had, only missing two days of work in the five months after she returned to work following surgery.

16.    As a result of DeNardi's cancer diagnosis and despite the fact that DeNardi was not disabled and could perform her job as effectively as she previously had, DRA developed a discriminatory perception that DeNardi was disabled and useless and DRA no longer wanted DeNardi in the workplace, and to force DeNardi from the workplace, DRA embarked on a reprehensible and malicious plan to make DeNardi's workplace so unbearably hostile, humiliating and demeaning that DeNardi would be unable to remain.

17.    To that end, DRA changed the manner in which it treated DeNardi by removing certain critical job responsibilities and reassigning them to another employee so that DeNardi had little or no work to do, humiliating DeNardi with a demotion from the senior position she had

4

held to a junior position and setting DeNardi up to fail, all done in the hope that either she would voluntarily leave her position at DRA or it would find a basis to fire her.

18.    DeNardi was demeaned and humiliated by DRA with insulting and inappropriate comments made by Barkanyi such as, "Is the chemo affecting your brain?" at which time Barkanyi's sister, Jackie Bourne ("Bourne"), another billing employee, would respond, "Maybe it's like Darlien (another employee), ever since she came back from having cancer she can't remember anything. Maybe the same thing is happening to Nancy."

19.    Further, and only because DRA perceived DeNardi as disabled, when she was not, and wanted her out of the workplace because of her colon cancer diagnosis, DRA discriminated against DeNardi by taking adverse employment action against her and creating a hostile work environment for her, which included, but was not limited to, and only by way of example, committing the following discriminatory acts:

- DeNardi was denied access to all employee timesheets and protocol sheets on Barkanyi's computer, even though she previously had access and needed the worksheets to perform her job duties, which effectively stripped DeNardi of her most substantive job duties so that she was rendered useless;

- Even though DeNardi was the main person involved in addressing the problems of the new front desk computer system, weekly meetings to discuss the computer system were held with Bourne and Carol Gustin ("Gustin"), another billing employee, and DeNardi was excluded, which humiliated her and was done to undermine her authority;

- DeNardi was excluded from meetings that involved projects and discussion she normally would have been included in, another humiliating act which caused her to be isolated and excluded;

5

- Gustin informed various DRA employees who had billing or insurance questions (a role DeNardi always handled), to go to herself, Bourne, or Shari McCauley ("McCauley") if Barkanyi was not available, even though DeNardi had traditionally held this role, which was designed to undermine and humiliate DeNardi;

- On March 2, 2006, while DeNardi was away from the office, Barkanyi and Bourne rifled through her desk behind her back and took all her work away from her, which DeNardi knew to be a common practice by management when someone was targeted for dismissal;

- On March 24, 2006, without prior notice to DeNardi, a memorandum was circulated to the whole staff announcing that a new person, McCauley, would be joining the staff to assist Barkanyi with all billing department operations, even though that was what DeNardi had been doing since being promoted in 2004, and essentially announcing to the entire Department that DeNardi was demoted, without telling her first;

- DeNardi was also shocked to learn that Gustin and Bourne were listed equally with McCauley, at the top of the organizational chart, as "Department Supervisors," a role DeNardi had been acting in, and was qualified for;

- Not only did DeNardi learn through a publicly-circulated memo that she was demoted, DeNardi discovered just how far down DRA thought of her now: She was listed at the bottom of the bottom, as the lowest person working on data entry.

The acts mentioned above are only examples of the many egregious, reprehensible, vicious and humiliating acts that took place during the period mentioned herein, and which created a frightening, hostile and abusive environment for DeNardi.

20.    The stress of the aforementioned atrocious and appalling acts committed against DeNardi by DRA left DeNardi feeling humiliated and betrayed because the same people who had consistently praised DeNardi's excellent performance and hard work now regarded her as undesirable solely because of her cancer diagnosis.

21.     When DeNardi continued to fight for her position by refusing to voluntarily quit,

the discrimination only intensified by the following acts:

- DeNardi was made to train McCauley (her replacement) to do DeNardi's own job, the job that she successfully held until DRA developed its wrongful and discriminatory perception about her medical condition. This was beyond humiliating;

- DeNardi's overtime was cut for no reason, even though Gustin and Bourne were allowed to work all the overtime hours they wanted, and DeNardi was aware that overtime cuts were usually reserved as a way for Barkanyi to get rid of employees she had expressed a desire to get rid of;

- Barkanyi tried to change DeNardi's hours that she had held for six years, and no one else was asked to do the same;

- Barkanyi began to copy Gustin on every email she wrote to DeNardi, and all DeNardi's work was double and triple-checked through one of the supervisors to create the impression that DeNardi was incompetent when she was not, a humiliating practice that no other employee had to endure;

- Setting DeNardi up to fail by criticizing her performance on a task for which she had received no training.

22.     DRA had no legitimate business reason for its conduct and none existed, and DeNardi was forced to deal with the discriminatory acts without remedy as there was no formal Human Resources person looking into these matters and employees who complained in the past were told by Joseph Chiseri ("Chiseri"), the Chief Administrative Officer at DRA, that DRA "always back managers, right or wrong."

23.     DeNardi knew she was being set up to fail and targeted for termination, yet Barkanyi always dismissed DeNardi's fears as a way to disguise DRA's attempt to get rid of her because of DeNardi's perceived disability.

7

24.    On Friday May 5, 2006, DRA finally found an opportunity to concoct a pretext to get rid of DeNardi, using an incident involving her daughter, Heather DeNardi ("Heather"), who worked part-time at DRA.

25.    For the length of DeNardi's employment at DRA it was a common practice among the employees and managers to punch each other's timecard out in the event one forgot to do so after he or she had already left for the day.

26.    This practice was beneficial to DRA because by punching out the timecard of an employee who forgot to do so DRA would not be responsible for that employee's salary when the employee was not at work.

27.    Prior to May 5, 2006, Barkanyi herself called DeNardi after forgetting to complete her timesheet with her departure time and called her to do so, and other managers at DRA did this as well as this had always been known as an acceptable procedure.

28.    On Friday May 5, 2006, Heather, who worked part-time at DRA, inadvertently forgot to punch out of work and minutes after leaving, called DeNardi and asked DeNardi to punch out for her, which DeNardi did in accordance with the DRA procedure.

29.    Approximately ten minutes after Heather's call, Barkanyi abusively confronted DeNardi demanding to know Heather's whereabouts because she claimed she had been looking

8

for Heather for half an hour, which DeNardi knew was untrue since DeNardi, Barkanyi and Heather had all been together moments before Heather's departure.

30.    Barkanyi then asked DeNardi if she had punched Heather's timecard and DeNardi said "yes" since it was office policy to punch out for an employee who forgot to do so.

31.    In response, Barkanyi told DeNardi that "Heather should look for a job elsewhere," even though there was no reason to terminate Heather other than to punish and hurt DeNardi as a means of getting DeNardi to quit.

32.    On May 8, 2006, the following Monday after DeNardi's daughter Heather was fired, DeNardi was called into Barkanyi's office, where Mark Newton ("Newton"), the Chief Financial Officer, informed DeNardi that she was being singled out and fired because, according to DRA, DeNardi failed to admit she punched Heather's timecard out, which was totally untrue since DeNardi freely admitted she did so in accordance with DRA's policy.

33.    The reason given by DRA for terminating DeNardi was a fabrication and thus a pretext that was derived to get rid of DeNardi because of her cancer diagnosis, and DRA's wrongful perception that she was disabled when she was not.

34.    As a result of DRA's discriminatory actions, DeNardi, among other things and only by way of example, has been caused to suffer the profound and lasting stigma of dismissal; the loss of benefits from DRA; the grief, depression, and emotional trauma DeNardi has already

and will continue to sustain because she was fired because she had cancer; and the financial loss DeNardi has and will continue to sustain because at her current job DeNardi is receiving less favorable salary terms than DRA.

35.    The damage inflicted upon DeNardi as a direct and proximate result of DRA's unlawful discrimination, based on DeNardi's cancer diagnosis, has and will cause a loss of income for DeNardi, emotional distress and has severely impacted upon the quality of her life.

36.    Here, the acts of DRA were done so clearly with reckless indifference in the face of a perceived risk that its actions would violate DeNardi's protected rights under Title I of the Americans with Disabilities Act and the New York State Human Rights Law, that, in addition to all the damages inflicted upon DeNardi and in addition to all the relief to which DeNardi may properly be entitled herein, DRA should also be required to pay punitive damages as punishment for its discriminatory conduct in order to deter DRA and others similarly situated from engaging in such conduct in the future.

### AS AND FOR THE FIRST CAUSE OF ACTION ON BEHALF OF DENARDI AGAINST DRA FOR PERCEIVED DISABILITY DISCRIMINATION IN VIOLATION OF TITLE I OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12112(a)

37.    DeNardi repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 36 of this Complaint, as though fully set forth at length herein.

10

38.    The entirety of the acts which constitute and form this cause of action, as set forth above, all of which are deemed and re-alleged herein as though said paragraphs were specifically set forth herein, were perpetrated upon DeNardi while she was in the course of her employment with DRA.

39.    Up to the time of the wrongful, unlawful, and discriminatory termination alleged herein, which was an adverse employment action, DeNardi was fully qualified for her position and performed her duties in that position, in a satisfactory fashion and was in a position to continue doing so for the remainder of her career.

40.    Given the circumstances surrounding DeNardi's termination, and the falsity of the pretext asserted by DRA, one can reasonably conclude that DeNardi was terminated under circumstances giving rise to a strong inference of perceived disability discrimination.

41.    The hostile, offensive, demeaning and intimidating work environment created by DRA, as described herein, was unwelcome to DeNardi and pervasively or severely altered the terms, conditions and privileges of her employment.

42.    As a proximate result of DRA's conduct, DeNardi has been adversely affected in her employment and in her normal life's pursuits, and DeNardi was caused to suffer injuries resulting in emotional anguish and suffering, and has been humiliated and demeaned because of DRA's discriminatory conduct in violation of DeNardi's human rights, all of which impacted upon her well-being and the quality of her life.

11

43.    The facts contained herein constitute unlawful discrimination against DeNardi by

DRA, based on DeNardi's perceived disability, in violation of Title I of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), which, inter alia, states that:

> "(a) General rule. - No covered entity shall discriminate against a
> qualified individual with a disability because of the disability of
> such individual in regard to job application procedures, the hiring,
> advancement, or discharge of employees, employee compensation,
> job training, and other terms, conditions and privileges of
> employment."

44.    On May 21, 2007, Plaintiff received a Notice of Right to Sue from the EEOC.

45.    As a direct and proximate result of DRA's violation of the ADA, DRA is liable to

DeNardi for damages, including punitive damages.

46.    Also as a direct and proximate result of DRA's violation of DeNardi's rights

under the law, DRA is liable to DeNardi for costs and reasonable attorney's fees, based on the

lodestar method as has been judicially established and accepted when attorney's fees are

provided for under the law.

47.    The acts of DRA were committed with reckless indifference, in the face of a

perceived risk that its actions would violate DeNardi's protected rights under the ADA, so that,

in addition to the damages inflicted upon DeNardi and in addition to all the other measures of

relief to which DeNardi may be properly entitled herein, DRA should also be required to pay

punitive damages for its discriminatory conduct, in order to deter DRA and others similarly

situated from engaging in such conduct in the future.

48.    DeNardi, therefore, seeks compensatory damages in this first cause of action, including, among other things, for loss of earnings and loss of earning capacity and for the emotional harm inflicted upon her, in an award to be determined at a trial of this matter, as well as punitive damages, reasonable attorney's fees, the costs of this action and prejudgment interest, in this first cause of action.

### AS AND FOR THE SECOND CAUSE OF ACTION ON BEHALF OF DENARDI AGAINST DRA FOR PERCEIVED DISABILITY DISCRIMINATION IN VIOLATION OF CHAPTER 18, ARTICLE 15 OF THE NEW YORK STATE EXECUTIVE LAW § 296(1)(a)

49.    DeNardi repeats, re-alleges and incorporates in full paragraphs 1 through 36 of this Complaint, as though fully set forth an length herein.

50.    The entirety of the conduct which constitutes and forms this cause of action, as set forth above, all of which is deemed repeated and re-alleged herein as though said paragraphs were fully and specifically set forth herein, were perpetrated upon DeNardi while she was in the course of her employment with DRA.

51.    DeNardi was in a protected class under the New York State Human Rights Law at the time DRA engaged in unlawful conduct, including adverse employment actions against her and actively creating a hostile work environment for the purpose of forcing her out of the company, because DRA perceived DeNardi as having an impairment that either prevented the exercise of a normal body function or is demonstrable by medically accepted techniques, due to her diagnosis of colon cancer and her medically required treatment thereof.

13

52.    Up to and during the time of DRA's wrongful, unlawful, and discriminatory actions against her, DeNardi was fully qualified for her position and performed her duties in that position in a totally satisfactory fashion, and would have continued to do so had she not been terminated by DRA.

53.    DRA, nevertheless, wrongfully perceived that DeNardi was disabled, when she was not, and wrongfully perceived that she suffered from a debilitating physical condition or impairment under the law, and as a result of that discriminatory perception, DRA unlawfully demoted and stripped away her managerial function, and ultimately unlawfully terminated DeNardi, all of which was adverse employment action.

54.    Given the circumstances surrounding DRA's actions against DeNardi, namely that DeNardi was demoted and replaced following her return to work after cancer treatment, as well as the fact that DRA's pretext is obviously a manufactured and concocted ploy to rid themselves of DeNardi, because the practice of punching other people out was a widely accepted procedure among the company, there is a strong inference that DRA's true basis for its adverse employment actions against DeNardi was discrimination.

55.    The aforementioned acts of DRA constitute unlawful perceived disability discrimination against DeNardi in violation of Chapter 18, Article 15 of the New York State Executive Law § 296(1)(a) (referred to herein as "the New York State Human Rights Law"), which inter alia, states that:

14

It shall be unlawful discriminatory practice: (a) For an employer because of the ... disability ... of any individual ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

56.    Under the New York State Human Rights Law § 292(21), the term "disability" is defined as an "impairment that substantially limits one or more major life activities" or "[a] condition regarded by others as such an impairment..."

57.    As a proximate result of DRA's conduct, DeNardi has been adversely affected in her employment, her well-being, in the quality of her life and in her normal life's pursuits, and DeNardi believes that DRA's conduct complained of herein has and will continue to have an irreparably devastating effect upon her life, all of which DeNardi alleges to be in the amount of Three Million ($3,000,000) Dollars.

58.    As a result of DRA's violation of the Human Rights Law, DRA is liable to DeNardi pursuant to § 297(4)(c) of said statute for "costs and reasonable attorney's fees" based on the lodestar method as judicially established and accepted when attorney's fees are provided under the law.

59.    DeNardi, therefore seeks in this second cause of action, including, among other things, monetary losses and emotional harm inflicted upon her in the sum of Three Million ($3,000,000) Dollars, plus the cost of this action as well as reasonable attorney's fees on this

15

cause of action based on the lodestar method as has been judicially established and accepted when attorney's fees are provided under the law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff DeNardi demands judgment in her favor and against Defendants on the First Cause of Action for both compensatory and punitive damages in an award to be determined at a trial of this matter and on the Second Cause of Action in the sum of Three Million Dollars ($3,000,000) in compensatory damages; plus, in both causes of action, reasonable attorney's fees as is permitted under the law, pre-judgment interest, the costs of this action and for such other relief as this Court may deem just and proper.

## JURY DEMAND

The plaintiff hereby demands a trial by jury.

**SCHWARTZ & PERRY, LLP**
*Attorneys for Plaintiff*

By: _____
DAVIDA S. PERRY (1879)
YAEL G. UTT (9000)
295 Madison Avenue
New York, New York 10017
(212) 889-6565

16