# EXHIBIT E

PART 1 OF 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

NANCY DENARDI,                         :

                    Plaintiff, : Docket No.

     -against-              : 07CIV5794

DRA IMAGING, P.C. and                  :    (MGC)

IMAGING SUPPORT SERVICES, LLC,   :

               Defendants. :

-------------------------------x

              June 17, 2008

              10:30 a.m.

    Deposition of Defendants, by **VIRGINIA BARKYANI,** held at the offices of Keane & Beane, P.C., 445 Hamilton Avenue, White Plains, New York, before a Notary Public within and for the State of New York.

1                          V. Barkyani

2    credentialing.

3         Q.    Do you know whether or not she has

4    had any training in handling complaints of

5    employment discrimination?

6         A.    No.

7         Q.    When you became manager of the

8    billing department after Gail Platt left, did

9    Mrs. DeNardi become billing department lead?

10        A.    When I took over after Gail Platt?

11        Q.    Yes.

12        A.    I did not make her billing department

13   lead.

14        Q.    I didn't ask you that.  I asked you

15   if she became billing department lead.  I

16   didn't ask who made her that or anything like

17   that.  I asked if she became billing department

18   lead on or about the time that you became the

19   manager.

20              MR. KLEIN:  Objection to the form.

21        You can answer.

22        A.    No.

23        Q.    At the time Mrs. DeNardi's employment

24   with DRA ended, what was her title?

25        A.    Billing department lead.

97

1                            V. Barkyani

2          Q.      So there was a period of time when

3   she held the position billing department lead;

4   is that correct?

5          A.      Yes.

6          Q.      Was that before or after you became

7   manager of the billing department?

8          A.      Before.

9          Q.      Was Gail Platt in any way involved

10  in the decision to make her billing department

11  lead, as you understand it?

12         A.      Yes.

13         Q.      She was?  Did you have any input?

14         A.      No.

15         Q.      What year did Mrs. DeNardi become

16  billing department lead?

17         A.      I don't know.

18         Q.      What were her duties as billing

19  department lead?

20         A.      She was assisting the insurance lead

21  with all the insurance rep questions.  She also

22  helped on the patient rep side.  She was very

23  good at taking patient calls and dealing with

24  their issues, authorizations, she would help

25  scheduling, front desk issues. She had a good

1                      V. Barkyani

2      knowledge of insurance.

3          Q.      Did she do refunds?

4          A.      She worked on refunds, yes.

5          Q.      Did she do client bills?

6          A.      I'm not sure what time frame, but

7      she does have experience with client bills.

8          Q.      I am talking about when she was

9      billing department lead.

10         A.      Probably, yeah.

11         Q.      So it's your testimony that

12     Mrs. DeNardi became billing department lead

13     before you became the manager?

14         A.      Yes.

15         Q.      And when she was billing department

16     lead, who was she reporting to?  When Nancy

17     DeNardi became billing department lead, who was

18     she reporting to?

19         A.      To myself.

20         Q.      So it's your testimony that Gail

21     Platt promoted her to that position to report

22     to you and you had no input in the decision?

23         A.      All the leads reported to me.  Nancy

24     was a billing department lead, there was an

25     insurance lead, a charge lead, a payment lead.

V. Barkyani

1

2  with Heather about coming to work at DRA?

3      A.      Nancy and Heather had asked if there

4  was anything available for Heather when she was

5  going to Dutchess Community in the fall, her

6  schedule would have been rather flexible and

7  kind of erratic from one semester to the other

8  and asked if there was anything available.

9      Q.      You said Heather and Nancy asked you

10  about Heather coming to work for DRA; is that

11  your testimony?

12      A.      Yes.

13      Q.      And were they together when they

14  spoke to you?

15      A.      No, they were not.

16      Q.      And other than what you're

17  testifying to today, is there any other proof

18  that you have that Nancy DeNardi was supportive

19  of Heather coming to work at DRA?

20      A.      Was she supportive?

21      Q.      Right.  Other than what you are

22  testifying to.

23      A.      There is nothing written.

24      Q.      How did you respond when you were

25  asked about opportunities for Heather?

1                        V. Barkyani

2          A.      I told them I would let them know

3    and I asked Mark about hiring her.

4          Q.      And that would be Mark Newton?

5          A.      Mark Newton.

6          Q.      What did you say to Mr. Newton?

7          A.      What did I say to him?

8          Q.      Yes.

9          A.      I asked him if it would be okay to

10   take Heather on during the school year a few

11   hours a week. He asked me if there was a need

12   and there was always a need in billing for

13   help.

14         Q.      And so he said yes?

15         A.      Yes.

16         Q.      And then what did you do?

17         A.      I let Nancy know that Heather could

18   work a couple of hours a week.

19         Q.      And who set Heather's salary?

20         A.      I guess Mark and I discussed it.

21         Q.      What was the salary going to be?

22         A.      I believe it was 8 or $9.

23         Q.      Per hour?

24         A.      Yes.

25         Q.      And was there an agreement as to

V. Barkyani

1   

2    what days she would work per week or was it

3    flexible, according to her schedule?

4    A.    Initially, it was flexible. As we

5    got a little tighter in the billing office and

6    space was tough -- probably a little on when

7    space got a little tighter, because we had been

8    planning on moving and as space got tighter we

9    had to specify which days and play with the

10    seating so that there was enough seating for

11    people.

12    Q.    When did she start? Would it have

13    been September of 2004?

14    A.    Yeah.

15    Q.    And for how long a period of time

16    was it more flexible where she would come in

17    sort of based on her schedule?

18    A.    For a year or so.

19    Q.    So from September '04 to September

20    '05, she sort of set the schedule that she

21    would come in?

22    A.    About. I mean, around that time we

23    hired a couple of additional people. It just

24    got tight. I don't have a definite time frame,

25    but it was flexible at first.

133

1                          V. Barkyani

2          A.    Yes.

3          Q.    Did everyone work out of a cubby

4    that was in the billing department?

5          A.    Yes.

6          Q.    As of October 1st, 2005, Nancy

7    DeNardi was the billing department lead; is

8    that correct?

9          A.    Yes.

10         Q.    And up until that point, from the

11   time she became billing department lead up to

12   October 1st, 2005, you never issued her any

13   written memo, E-mail, letter, any other written

14   document in which you criticized her

15   performance; correct?

16         A.    Nothing written.

17         Q.    Who is Carolyn Huyler?

18         A.    She was a billing office employee.

19         Q.    Did she work in the charge area?

20         A.    Yes.

21         Q.    And do you recall what account was

22   assigned to her?  And if "account" isn't the

23   right word, feel free to correct me.

24         A.    Well, at what time?

25         Q.    In 2004.

134

1                          V. Barkyani

2              Let me ask it this way:  Do you

3    recall a period of time when she worked on the

4    Vassar Brothers Medical Center charges?

5         A.    She did work on that interface.

6         Q.    Was that in --

7         A.    I can't recall the dates.

8         Q.    And who is Ronnee Monroe?

9         A.    She is also a billing office

10   employee.

11             She was a lead at one time.  I don't

12   know what time period, if you are going to ask

13   me that, over the charge area.

14        Q.    And do you recall a period of time

15   when she had the Columbia Memorial Hospital

16   account assigned to her?

17        A.    Ronnee?

18        Q.    Correct.

19        A.    Yes, she worked on that.

20        Q.    Did there come a point in time where

21   you began to become critical of Carolyn

22   Huyler's performance?

23        A.    It wasn't a point in time.  Carolyn

24   always made a lot of errors and she did not

25   exhibit the best judgment when making patient

1                          V. Barkyani

2      phone calls.

3          Q.      And you were critical of those

4      issues?

5          A.      Yes.

6          Q.      And did you prepare a written

7      document outlining some of the concerns you had

8      about Ms. Huyler's performance and then conduct

9      a meeting with her to discuss them?

10         A.      I think I did.

11         Q.      And was Mrs. DeNardi present during

12     that meeting?

13         A.      I believe so.  Someone was present

14     with me when I met with Carolyn.

15         Q.      Well, if Mrs. DeNardi were to

16     testify that she was present during that

17     meeting, do you have any information that would

18     demonstrate that that was incorrect?

19                 MR. KLEIN:  Objection to the form.

20                 You can answer.

21         A.      Somebody was present with me.  I

22     would have to look at my notes.

23         Q.      Did you take notes during your

24     meeting with Ms. Huyler?

25         A.      Not during the discussion with her.

1                     V. Barkyani

2        A.      I believe it talks about a dress

3    code.   It's changed over the years.

4        Q.      But there is a dress code that's

5    referred to in the --

6        A.      I believe there is something in

7    there about dress code.   There were many memos

8    over the year that went out about dress code

9    much more specific and detailed than what's

10   located in that book there.

11       Q.      So would it be fair to say that that

12   section of the handbook was updated from time

13   to time?

14       A.      Yes.

15       Q.      When you met with Carolyn Huyler to

16   discuss the concerns, did you give her a copy

17   of the write-up that you had prepared?

18       A.      Yes.

19       Q.      And did she read it in your office?

20       A.      I believe so.

21       Q.      And what did she say in response?

22       A.      I don't recall.

23       Q.      Do you still have a copy of the

24   write-up that you wrote for Carolyn Huyler in

25   her file in your office?

1                          V. Barkyani

2          A.      It's probably in my file.

3          Q.      What was your position at that time?

4    Were you assistant manager or were you the

5    manager?

6          A.      I would need to see the date on the

7    memo.

8          Q.      You don't recall what position you

9    had?

10         A.      I don't recall offhand.

11         Q.      Did you ever prepare any other

12   written rite-ups of any employees, either when

13   you were assistant manager or when you were

14   manager?

15         A.      I may have.  I would have to check

16   my file.

17         Q.      As you are sitting here now, we have

18   just discussed Carolyn Huyler and you prepared

19   a write-up for her; correct?

20         A.      Yes.

21         Q.      As you are sitting here now, can you

22   think of any other employees who you had

23   prepared a write-up for?

24         A.      I believe Katina Collins.

25         Q.      Do you remember when that was?

140

1                          V. Barkyani

2        A.     No.

3        Q.     Do you remember what position you

4    held?

5        A.     I would have to look at the date on

6    the memo.

7        Q.     Would you have put a copy of the

8    write-up in a file that you maintained?

9        A.     I should have, or Sue K. Would have

10   a copy.

11       Q.     And that would be a file that was

12   called "Katina Collins" or "Collins, Katina"?

13       A.     Something like that, yes.

14       Q.     Any other employees?

15       A.     I can't recall.

16       Q.     Was there more than just the two?

17       A.     There may have been.

18       Q.     Did there come a point in time where

19   Carolyn Huyler went out on disability?

20       A.     Yes.

21       Q.     Was that after you discussed the

22   write-up with her?

23       A.     I believe so.

24       Q.     When she went out on disability, who

25   took over her account?

V. Barkyani

1

2      A.      Yes, Nancy's husband.

3      Q.      Was she in the hospital at the time

4   that he had advised you that they had found

5   cancer?

6      A.      Yes.

7      Q.      How long was she in the hospital?

8      A.      A few days, maybe.

9      Q.      Was she out on disability for a

10  period of time after the surgery?

11     A.      Yes, after her second surgery.

12     Q.      How long?

13     A.      She came back December 5th and was

14  out from October, mid October some time until

15  December 5th.

16     Q.      How are you able to remember that

17  specific date, December 5th?

18     A.      Because my sister and I went on

19  vacation that week and, unfortunately, had to

20  leave Carol -- we were gone.  That was Nancy's

21  first day back and we were going to miss her

22  first day back.

23     Q.      When did you leave for vacation?

24     A.      Saturday, perhaps.

25     Q.      How long were you going to be away?

1                         V. Barkyani

2       desk.

3           Q.      Now, you said in March 2006 she was

4       working on Cerner so she shouldn't have had a

5       lot of work on her desk?

6           A.      Correct.

7           Q.      Had her job duties been removed from

8       her so that she could just work on Cerner?

9           A.      After she was back for a few weeks

10      around holiday time 2005, I asked Nancy if she

11      would like to take over the Cerner interface.

12      She was involved in the project almost from its

13      inception, she knew all the problems associated

14      with it.  It was certainly an important function

15      to DRA.  It's the backbone for the company's

16      financial health.  There were not many people

17      in the department that could really work on

18      that interface because of all the issues and

19      problems with it.

20          Q.      And what did she say?  You said you

21      asked her if she wanted to get involved in it.

22          A.      Right.  I spoke about all that I

23      just stated.  There was nobody in the

24      department, really, that we could give it to.

25      I asked her if she wanted to take it over and

1                     V. Barkyani

2    she said, yeah, if you want me to.

3         Q.    Now, Carol Gustin was working on the

4    Cerner interface at that point; correct?

5         A.    Carol and Jackie had been working on

6    it, yes.

7         Q.    At the time you had the conversation

8    with Mrs. DeNardi, was Carol still working on

9    the Cerner interface?

10        A.    Yes.

11        Q.    Was Jackie still working on the

12   Cerner interface?

13        A.    Yes.

14        Q.    Were you working on the Cerner

15   interface?

16        A.    Not directly.  We were all working

17   on the problem, but the interface itself,

18   getting the charges into the system, ironing

19   out the bugs, was Carol and Jackie.

20        Q.    And when you had this conversation

21   with Mrs. DeNardi -- and you say it was around

22   the holidays in December of 2005; correct?

23        A.    Yes.

24        Q.    -- were you asking her to become

25   involved along with Carol and Jackie or were

V. Barkyani

1

2     you asking her to take over the entire

3     interface itself?

4         A.    No, I needed someone to take it

5     over.  I needed to get Jackie out of there.

6     There were just too many payment problems,

7     contract problems, which is what Jackie worked

8     on.  And Carol, I needed to get out of there a

9     little bit, too.  I needed to put somebody else

10    on that project.  Nancy would have been the

11    perfect choice.  Her background was perfect for

12    it, she had a lot of insurance knowledge.  She

13    was probably one of the best people for the

14    project, even over Jane.  Jane was involved in

15    the project initially, who is kind of under

16    Nancy, but Jane asked to be removed from the

17    project because it was just too stressful.  So

18    Nancy said, sure, if you want me to take it

19    over, I'll do it.

20        Q.    Was anybody present when you had

21    this conversation with Mrs. DeNardi?

22        A.    No, I believe it was just Nancy and

23    myself.

24        Q.    Where were you located when this

25    conversation took place?

V. Barkyani

1

2    A.     In my office.

3    Q.     How long did the conversation take?

4    A.     Maybe only ten minutes or so.

5    Q.     Did you make any notes?

6    A.     I don't believe I did.

7    Q.     Other than your testimony that such

8  a conversation took place, do you have any

9  other proof that would verify that you, in

10  fact, asked Mrs. DeNardi to take over the

11  entire interface and that she agreed?

12          MR. KLEIN:  Objection to the form.

13          You can answer.

14    A.     I believe in her deposition she

15  relayed that conversation.  So, aside from that

16  -- I mean, just that particular conversation

17  with her saying she would take it over, there

18  was nobody else present.

19    Q.     It's essentially your word against

20  Mrs. DeNardi's word; correct?

21          MR. KLEIN:  Objection to the form.

22          You can answer.

23    A.     I think she even relayed that

24  conversation.

25    Q.     Did you discuss what would happen to

V. Barkyani

1

2    her other job responsibilities if she agreed to

3    take over Cerner exclusively?

4        A.    Yes.

5        Q.    And what did you say in that regard?

6        A.    I had told her that she could not do

7    her present job function and that it was just

8    too much.  Cerner needed her whole focus; that

9    she would be working with Carol; Carol would

10   train her on that, as Carol had been with that

11   from before go live and had been working out

12   all the problems since then, and she said okay.

13       Q.    Was Carol very frustrated with the

14   project at that point?

15       A.    At the point that I asked Nancy to

16   take it over?

17       Q.    Yes.

18       A.    No.  It was actually looking a

19   little better.  The bugs were being worked out.

20       Q.    Was it essentially a data entry

21   function where you were just inputting

22   information into the system?

23       A.    Not at all.

24       Q.    What did that function involve?

25       A.    It involved some type of programming

239

V. Barkyani

1

2      A.      Well, she could come to me as a

3  supervisor.  I am the overall department

4  operations manager.

5      Q.      Could the new supervisor terminate

6  Ronnee Monroe?

7      A.      No.

8      Q.      Were you the only person that could

9  terminate any of the people in the billing

10  department?

11      A.      I couldn't even just terminate

12  anybody in the billing department.

13      Q.      You needed authorization from

14  somebody?

15      A.      Yeah.

16      Q.      Who?

17      A.      Mark Newton.

18      Q.      Could Carol Gustin terminate anybody

19  in the billing department?

20      A.      No.

21      Q.      Could Jackie Bourne?

22      A.      No.

23      Q.      When, in relation to the job

24  posting, did you interview Shari McCauley?

25      A.      Probably pretty close to the

V. Barkyani

 1     for the operations of the department; correct?

 2          A.     Correct.

 3          Q.     As manager, do you handle financial

 4     reports for the company presently?

 5          A.     No.

 6          Q.     Who does that?

 7          A.     Kathy Rambo.

 8               MS. PERRY:  Since we are going to

 9     come back for a brief period of time, why

10     don't we call it a day now?

11               MR. KLEIN:  That's fine.

12               MS. PERRY:  We're going to end for

13     today.

14               (Time noted:  4:50 p.m.)

15

16

17               _____

18               Virginia Barkyani

19

20     Subscribed and sworn to before me

21     this _6_ day of _August_, 2008.

22

23     _____

24     Notary Public

CHRISTINE PALUMBO
Notary Public, State of New York
No. 01PA6077156
Qualified in Orange County
Commission Expires July 08, 20_10_

25

1

C E R T I F I C A T E

2

3

4    STATE OF NEW YORK        )

5                             : ss.

6    COUNTY OF NEW YORK       )

7

8            I, ERIC ALLEN, a Notary Public

9    within and for the State of New York, do

10   hereby certify:

11           That VIRGINIA BARKYANI, the witness

12   whose deposition is hereinbefore set forth,

13   was duly sworn by me and that such

14   deposition is a true record of the

15   testimony given by the witness.

16           I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, and that I am

19   in no way interested in the outcome of this

20   matter.

21           IN WITNESS WHEREOF, I have hereunto

22   set my hand this 2nd day of July, 2008.

23

24   _____

25   ERIC ALLEN

## ERRATA SHEET

**Deposition of Virginia Barkanyi, held on June 17, 2008**

Re:    *DeNardi v. DRA Imaging, P.C., et al.*, 07 Civ. 5794 (MGC)

| PAGE | LINE(S) | READS | SHOULD READ | REASON FOR CHANGE |
|------|---------|-------|-------------|-------------------|
| 4 | 2 | Barkyani | Barkanyi | misspelling |
| 48 | 3 | manager | director | Clarification |
| 115 | 2 | Note | No | typo |
| 119 | 8 | mother | more | typo |
| 35 | 2 | No | Yes. Shari McCauley | Clarification |
| 138 | 8 | Year | Years | Clarification |
| 201 | 21 | off | auth | Clarification |
| 233 | 2 | in | and | Clarification |
| 255 | 3 | did I | I did | Clarification |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Virginia Barkanyi

Sworn to before me this
6 day of August, 2008

Christine Palumbo
Notary Public

CHRISTINE PALUMBO
Notary Public, State of New York
No. 01PA6077156
Qualified in Orange County
Commission Expires July 08, 20