# EXHIBIT E

**PART 2 OF 2**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK



-------------------------------x

NANCY DENARDI,                          :

               Plaintiff, : Docket No.

    -against-              : 07CIV5794

DRA IMAGING, P.C. and            :    (MGC)

IMAGING SUPPORT SERVICES, LLC,   :

           Defendants. :

-------------------------------x

         July 18, 2008

         1:36 p.m.


    Continued deposition of **VIRGINIA BARKYANI**,

taken by Plaintiff, pursuant to Adjournment,

at the offices of Keane & Beane, P.C.,

445 Hamilton Avenue, White Plains, New York,

before Joseph R. Danyo, a Shorthand Reporter

and Notary Public within and for the State of

New York.

1

2    V I R G I N I A    B A R K Y A N I,    having

3        been resworn by Joseph R. Danyo, a Notary

4        Public for the State of New York, was

5        examined and testified further as follows:

6    **EXAMINATION CONTINUED**

7    **BY MS. PERRY:**

8        Q.    Do you need me to go over the

9    instructions again from the last time?

10        A.    No, I don't think so.

11        Q.    On May 5, 2006, when Mrs. Denardi

12    allegedly lied to you about punching Heather

13    out, was anybody else present?

14        A.    Present when?

15        Q.    When she allegedly lied to you.

16        A.    No.

17        Q.    When did the conversation take place?

18        A.    On May 5.

19        Q.    At what time?

20        A.    Approximately 10:05 to about 10:15,

21    10:20.

22        Q.    That is when it took place?  It took

23    place between 10:05 and 10:15?

24        A.    The conversation that I had with

25    her, yes.

V. Barkyani

1

2   A.   The first sentence, Nancy Denardi

3   was terminated on 5/8 for falsifying time

4   records for another employee.

5   Q.   Other than stating a date of the

6   termination, there is no description of what

7   occurred during that meeting when she was told

8   she was being terminated, correct?

9   A.   Not by myself.

10  Q.   Well, who was in the meeting?

11  A.   Mark Newton was also in the meeting

12  on 5/8.

13  Q.   And Nancy Denardi was there, correct?

14  A.   Yes.

15  Q.   And yourself, correct?

16  A.   Um-hum.

17  Q.   Did you ever see any statements that

18  Mr. Newton wrote about what occurred on May 8?

19  A.   No, I have not.

20  Q.   Did you ever write any statements

21  about what occurred during the meeting on May 8?

22  A.   No.  Just this indication here for

23  that day.

24  Q.   That the termination occurred on

25  May 8, correct?

290

V. Barkyani

1    the organizational charts and the job duty

2    sheets.  Were those documents that have already

3    been marked as exhibits during the depositions?

4    A.     I believe so, and I had one sheet

5    with a few dates on it that we just went over,

6    some of the dates that were previously asked

7    that I didn't have the exact date.

8    Q.     Were those notes that you had made?

9    A.     Just my own notes.

10   Q.     Did you review any notes that you

11   took during any of the depositions you have

12   attended to prepare for today's deposition?

13   A.     No.

14   Q.     Did you speak to Mark Newton on

15   May 5 about your interaction with Mrs. Denardi

16   at  around 10 o'clock during the morning?

17   MS. BURNS:  Objection to form.

18   You can answer.

19   A.     I spoke to Mark shortly before I

20   left for the day, which was around lunchtime on

21   Friday the 5th.

22   Q.     Why were you leaving at lunchtime?

23   A.     I had an appointment that day, I

24   believe.

298

V. Barkyani

1        

2     A.    I could have printed it out on more

3    than one occasion, if I updated something.  I

4    could have reprinted it and then just added

5    notes to it later.

6     Q.    Do you know for a fact whether that

7    is what you did?  I really don't want you to

8    guess.  We are not here for guessing.

9     A.    Then I can't answer your questions

10   here.  I did not date the document, and I did

11   not date every entry on it, so I can't answer

12   your question.

13    Q.    Did you ever give Mrs. Denardi any

14   written memo or warning about any of the

15   incidents that you have attributed to her?

16    A.    No.

17    Q.    Did you ever give Heather Denardi

18   any written memo or warning about any of the

19   incidents you attribute to her?

20    A.    No, this was not used for write-up.

21   It was a list that I made.  When I need to talk

22   to employees about certain things, I jot it

23   down, and then, when I have time, many of these

24   things Nancy and I discussed.

25    Q.    Did you ever have a meeting with

308

1                    V. Barkyani

2     punch out during lunch because she was going to

3     be discussing Cerner with you while you ate?

4         A.    Yes.

5         Q.    What about Carol Gustin?

6         A.    Carol fills out a time sheet.  She

7     accounts for her time a little differently, so

8     I'm not sure.

9         Q.    Was she paid when she would have

10    lunch?  Was she paid during her lunch period?

11        A.    No.

12        Q.    And, if she didn't punch out, then

13    there would be no record that she was at lunch

14    during that period, correct?

15        A.    It automatically deducts it if you

16    go over six hours, the software.

17        Q.    What proof do you have other than

18    what you are testifying to that Jackie was

19    working on a Cerner project during lunch for

20    any period of time?

21               MS. BURNS:  Objection to form.

22               You can answer.

23        A.    It is my testimony.  That is all.

24        Q.    The last time you were deposed, we

25    talked about an employee named Carolyn Huyler.

1                        V. Barkyani

2      Do you recall discussing her during your last

3      deposition?

4            A.      Briefly.

5            Q.      She had some performance problems,

6      is that correct?

7            A.      Yes.

8            Q.      According to records that we recently

9      received from DRA, you had a number of meetings

10     at which you sat down with Nancy Denardi and

11     discussed Mrs. Huyler's performance deficiencies.

12                   Do you remember having meetings at

13     which you discussed Mrs. Huyler's performance

14     problems?

15           A.      Yes.

16           Q.      When you met with Ms. Huyler to

17     discuss her performance problems, did you

18     outline what the problems were?

19           A.      Yes.

20           Q.      You told her what she was doing

21     wrong?

22           A.      Yes.

23           Q.      And were you doing that in an

24     attempt to help her to improve?

25           A.      Yes.

1                          V. Barkyani

2          Q.    When you first detected a performance

3    problem, you just didn't go in and fire her,

4    correct?

5          A.    That's correct.

6          Q.    And you had a number of meetings

7    with her, correct?

8          A.    Informal as well as formal.

9          Q.    And, when there was a formal

10   meeting, you prepared a write-up?

11         A.    That's correct.

12               (Plaintiff's Exhibit 15, Memo

13         reflecting meeting of April 11, 2005, was

14         so marked for identification.)

15         Q.    Tell me after you have had a chance

16   to look at Exhibit 15.

17         A.    Okay.

18         Q.    Did you prepare Exhibit 15?

19         A.    Yes.

20         Q.    Does that reflect a meeting that you

21   had with Carolyn Huyler with Nancy Denardi on

22   April 11, 2005?

23         A.    Yes.

24         Q.    During that meeting, did you outline

25   some of the deficiencies that you observed with

311

                              V. Barkyani

1

2    regard to Ms. Huyler's performance?

3         A.    Yes.

4         Q.    Did you give her suggestions during

5    that meeting as to how she could improve?

6         A.    Yes, there was an ongoing process

7    with Carolyn constantly giving her suggestions

8    and hints at how to better perform her job.

9         Q.    Did you find that procedure helpful

10   where you would sit down with an employee, and

11   if there was a problem, outline the problems

12   and try to strategize as to how the employee

13   could improve?

14        A.    Yes.

15        Q.    Did you feel that that was one of

16   your job responsibilities as billing department

17   manager?

18        A.    Yes.

19        Q.    The reporter has marked Plaintiff's

20   Exhibit 16.

21             (Plaintiff's Exhibit 16, Memo

22        reflecting meeting, was so marked for

23        identification.)

24        A.    Okay.

25        Q.    Did you prepare Exhibit 16?

312

1                    V. Barkyani

2        A.      Yes.

3        Q.      This reflects another meeting that

4    you had with Carolyn Huyler about her performance?

5        A.      That's correct.

6                (Plaintiff's Exhibit 17, Final

7        warning signed June 23, 2005, was so

8        marked for identification.)

9        Q.      If you could look at Exhibit 17 and

10   let me know when you are done.

11       A.      Okay.

12       Q.      Did you prepare Exhibit 17?

13       A.      Yes, I did.

14       Q.      That is a written warning, a final

15   warning that you issued to Carolyn Huyler, is

16   that correct?

17       A.      That's correct.

18       Q.      And she signed it on June 23, 2005,

19   correct?

20       A.      Yes.

21       Q.      How long a period of time would you

22   say you spent prior to issuing this final

23   warning coaching and counseling her about her

24   performance problems and helping her to improve?

25               MS. BURNS:  Objection to form.

V. Barkyani

1

2          You may answer.

3     A.      Carolyn's issues went back to even

4   when Gail Platt was there, so years.  Probably

5   a year and a half at the point that I wrote

6   these up.  I tried to sit with Carolyn and

7   retrain and  give her guidelines.  Ronnee

8   Monroe also sat with Carolyn, tried to show her

9   how she would work certain things.

10          I am sure Nancy had some dealings

11  with Carolyn in reviewing some of the errors

12  that we would find in her work, so it was a

13  long time of training and trying to retrain

14  before I started the write-up process.

15    Q.      Were some of the problems that she

16  had pretty serious problems?

17    A.      As far as?

18    Q.      Her position.

19    A.      Causing work flow problems?

20    Q.      Yes.

21    A.      Yes.

22    Q.      What was her job?

23    A.      She performed the charge function

24  for the hospitals.

25    Q.      And it appears from reviewing the

314

                        V. Barkyani

2    documents, and please correct me if I am wrong,

3    that she was having difficulty in many different

4    areas performing her job, is that correct?

5                   MS. BURNS:  Objection to form.

6                   You may answer.

7         A.    Her job entailed many different

8    functions, so, yes, she had a difficult time

9    almost in each function that she did.

10        Q.    And in the final warning it talks

11   about an error rate being high.  Do you see

12   that in the third bullet?

13        A.    Yes.

14        Q.    Does that mean she was making a lot

15   of mistakes?

16        A.    Yes.

17        Q.    Was she also having difficulty in

18   speaking with patients?

19        A.    Yes.

20        Q.    Were there any issues about racial

21   comments that she had made?

22        A.    Yes.

23        Q.    Were there any problems with

24   anti-Semitic comments that she had made?

25        A.    Yes.  That was reported to me at one

1                              V. Barkyani

2      point too.

3           Q.      Did you find that to be unacceptable

4      in the workplace?

5           A.      Absolutely.

6           Q.      You don't want your employees making

7      racial comments, do you?

8           A.      Absolutely not.

9           Q.      And you don't want your employees

10     making disparaging comments about Jews, do you?

11          A.      Correct.

12          Q.      When were those issues brought to

13     your attention, first brought to your attention?

14          A.      Which issues?

15          Q.      That she had made some racial comments

16     or some anti-Semitic comments.

17          A.      I don't have a date.

18          Q.      When was she terminated?

19          A.      I don't know that she was terminated.

20     She went out on disability.

21          Q.      How soon after she received this

22     final warning did she go out on disability?

23          A.      Pretty close to this date, I think.

24     I don't have the exact date.

25          Q.      Were the comments that she had made,

316

1                          V. Barkyani

2    the racial comments and the anti-Semitic

3    comments, made before she received the final

4    warning?

5         A.    Yes.

6         Q.    Were they made before your April

7    meetings with her?

8         A.    Yes.

9               (Plaintiff's Exhibit 18, Payroll form

10        for January 7, 2005 through December 22,

11        2006, was so marked for identification.)

12        Q.    Please take a look at Exhibit 18 and

13   let me know after you have done that.

14        A.    Okay.

15        Q.    What is Exhibit 18?

16        A.    It looks like an HR form for payroll.

17        Q.    Does your handwriting appear on this

18   form at all?

19        A.    No.

20        Q.    Was this document prepared by Sue K.?

21        A.    I believe so.

22        Q.    And this is a payroll form for your

23   sister, correct?

24        A.    Yes, her name is at the top of the

25   form.

V. Barkyani

1

2  where she worked 80 hours after April of '06

3  where she worked overtime, correct?  For example,

4  June 23, '06?

5      A.    It looks like maybe three or four

6  weeks for the year.  Three or four weeks out of

7  the year.

8      Q.    I'm not asking you to quantify it.

9  My question was did she work overtime after

10  April '06?

11     A.    It looks like there are a few

12  payrolls with overtime.

13          (Recess taken)

14          MS. PERRY:  I have no further

15      questions.

16          (Time noted:  2:57 p.m.)

17

18  _____

19  VIRGINIA BARKYANI

20

21  Subscribed and sworn to before me

22  this 29 day of August , 2008.

23

24  _____

25  Notary Public

SUSAN KALOGIANNIS
Notary Public, State of New York
No. 01KA6040547
Qualified in Ulster County
Commission Expires April 24, 20 10

321

1

2                      C E R T I F I C A T I O N

3

4              I, Joseph R. Danyo, a Shorthand

5      Reporter and Notary Public, within and for the

6      State of New York, do hereby certify:

7              That I reported the proceedings in

8      the within entitled matter, and that the within

9      transcript is a true record of such

10     proceedings.

11             I further certify that I am not

12     related, by blood or marriage, to any of the

13     parties in this matter and that I am in no way

14     interested in the outcome of this matter.

15             IN WITNESS WHEREOF, I have hereunto

16     set my hand this 24th day of July, 2008.

17

18                    _____

19                    JOSEPH R. DANYO

20

21

22

23

24

25

## ERRATA SHEET

Deposition of Virginia Barkanyi, held on June 17, 2008

Re:    *DeNardi v. DRA Imaging, P.C., et al.,* 07 Civ. 5794 (MGC)

| PAGE | LINE(S) | READS | SHOULD READ | REASON FOR CHANGE |
|------|---------|-------|-------------|-------------------|
| 267 | 2 | Barkyani | Barkanyi | misspelling |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

_Virginia Barkanyi_
Virginia Barkanyi

Sworn to before me this
29 day of august , 2008

_Susan Kalogiannis_
Notary Public

SUSAN KALOGIANNIS
Notary Public, State of New York
No. 01KA6040547
Qualified in Ulster County
Commission Expires April 24, 20__