UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
NANCY DENARDI,

                    Plaintiff,          <u>OPINION</u>

      -against-                07 Civ. 5794 (MGC)


DRA IMAGING, P.C. and IMAGING SUPPORT
SERVICES, LLC,

                    Defendants.

--------------------------------X

APPEARANCES:

        SCHWARTZ & PERRY, LLP
        Attorneys for Plaintiff
        295 Madison Avenue
        New York, New York  10017

        By:  Davida S. Perry, Esq.
             Brian Heller, Esq.

        KEANE & BEANE, P.C.
        Attorneys for Defendant
        445 Hamilton Avenue, 15th Floor
        White Plains, New York  10601

        By:  Stephanie L. Burns, Esq.
             Lance H. Klein, Esq.


**Cedarbaum, J.**

      Nancy DeNardi sues DRA Imaging P.C. ("DRA") and Imaging

Support Services, LLC ("ISS") pursuant to Section 12112(a) of

Title I of the Americans with Disabilities Act ("ADA") and

Chapter 18, Article 15 of New York Executive Law Section

296(1)(a) ("New York Human Rights Law") for terminating her

because of an erroneous perception that she was disabled.
Defendants move for summary judgment dismissing the complaint in
its entirety.  Because DeNardi provides sufficient evidence to
make out a prima facie case of discrimination and to raise a
genuine issue of material fact as to whether defendants' reason
for her termination is pretextual, defendants' motion for summary
judgment is denied.

## BACKGROUND

DeNardi began her employment in September 1999 in the ISS
billing department.  The parties dispute whether it was only ISS
or both defendants DRA and ISS who employed her.  DRA, which was
organized as a New York professional corporation in 1989, is in
the business of rendering professional radiology services.  ISS
is a New York limited liability company that was formed in July
of 1996 and is comprised of two members, DRA and Vassar Brothers
Hospital. ISS is in the business of providing management,
facilities and equipment to entities engaged in the practice of
medicine.  According to the operating agreement signed by DRA and
Vassar Brothers, ISS is run by an "operating committee" that
consists of four members, two appointed by DRA and two appointed
by Vassar Brothers.

At the time of ISS's formation in July 1996, ISS and DRA
entered into an agreement under which, for specified

compensation, ISS would provide management, billing, transcription and equipment leasing services to DRA.  Mark Newton was initially hired by ISS as its chief financial officer ("CFO").  Joseph Chiseri was initially hired by ISS to be its chief administrative officer ("CAO").  In 2004, Newton and Chiseri's employment contracts were assigned from ISS to DRA, such that Newton became the CFO of DRA and and Chiseri the CAO of DRA.  However, the assignment included the proviso that ISS would continue to receive personal services from Newton and Chiseri consisting of hiring, firing and disciplining ISS personnel and supervising the day to day operations of ISS.  DRA and ISS also operate out of the same facility.

Throughout her employment in the ISS billing department, DeNardi received pay checks and W-2 forms from ISS.  However, DeNardi's business card and security identification card both read "DRA Imaging, P.C."  In addition, DeNardi's health and life insurance were provided under the group name "DRA."  Some of the employment forms signed by DeNardi, including an employment application and a confidentiality statement, were entitled "DRA Imaging, P.C./Imaging Support Services, LLC."  The name "DRA Imaging, P.C./Imaging Support Services, LLC" was also printed on a new employee benefit checklist that DeNardi completed on her first day of work as well as the Employee Handbook she was given.

3

During her employment, DeNardi advanced from insurance representative to insurance representative lead to billing department lead and her salary increased from $9.75 to $18.50 per hour.  Her annual performance reviews rate all aspects of her work as "very good" or "outstanding." Heather DeNardi, plaintiff's daughter, was hired as a part time insurance agent by ISS in September of 2004.

In October of 2005, DeNardi was diagnosed with colon cancer. She was hospitalized and underwent surgery.  As a result, she was absent from work from October through December of 2005.   When she returned to work, she was absent for approximately two to four hours on Tuesdays and approximately half an hour to one hour on Thursdays for medical procedures in connection with chemotherapy treatment.  She also advised her supervisor, Virginia Barkyani, that there was a small possibility that she would need to undergo further surgery.

DeNardi testified at her deposition that her relationship with Barkyani changed when she returned to work in December of 2005.  According to DeNardi, Barkyani stopped spending time with her on breaks, gave her less challenging assignments, excluded her from meetings with her co-workers, and removed work from her desk without her knowledge and returned it with post-it notes giving her instructions on how to perform certain tasks. DeNardi also testified that on one occasion in January of 2006, Barkyani

accused her of forgetting to do something and asked her if the
"chemo was affecting [her] brain."  In addition, she testified
that after she returned from her cancer surgery, Mark Newton, who
had responsibility for hiring, firing and disciplining employees
of ISS, began ignoring her in the hallways of the office.

Sometime in February or early March of 2006, Barkyani
assigned DeNardi to the operation of a new computer system, the
Cerner Interface, which DRA and ISS had recently installed for
billing and appointment scheduling.  DeNardi considered the new
assignment to be a demotion because she found the work to be less
challenging than her prior assignments. Although DeNardi's
responsibilities changed at this time, her hourly wage remained
the same.

On May 5, 2006, approximately five months after DeNardi
returned to work, Heather DeNardi forgot to clock out as she was
leaving the office.  Upon realizing that she had forgotten to
clock out, Heather called her mother, who proceeded to clock her
out.  The parties dispute whether employees were instructed that
they were the only ones who should clock themselves in and out.
DeNardi affirms that clocking other employees in and out was an
"on-going and well-accepted course of conduct at DRA" and that
DRA never instructed its employees to keep their passwords
confidential.  She also affirms that fellow employees who arrived
late to work would often call out for someone to punch them in as

they were rushing to get to their desk.  DeNardi says she clocked
in one of her coworkers in this manner almost every day.  On one
occasion, even her supervisor, Barkyani, called DeNardi and asked
DeNardi to clock her out because she had forgotten to do so.  DRA
disputes that this was an accepted course of conduct.  DRA has
produced a "Security and Confidentiality Agreement" signed by
DeNardi on April 1, 2003, in which DeNardi explicitly agreed not
to "log on to any of the Company's computer systems that
currently exist or may exist in the future using a password other
than my own."

     Later in the day on May 5, 2006, Barkyani spoke to DeNardi
about the fact that she had clocked out her daughter.  The
parties dispute what was said during this conversation.  Barkyani
testified at her deposition that when she asked DeNardi whether
she had clocked out her daughter, DeNardi initially denied doing
so but after further discussion, admitted to it.  DeNardi, on the
other hand, denies that she ever lied.  Rather, according to
DeNardi's testimony, she readily admitted to clocking out her
daughter.

     After this conversation took place on May 5, 2006, Barkyani
met with Mark Newton and reported what was said.  Based on his
conversation with Barkyani, Newton made the decision to terminate
DeNardi.

On May 8, 2006, Newton and Barkyani met with DeNardi to inform her that she was being terminated.  Also on May 8, 2006, Newton sent his superiors an email reporting that he had fired DeNardi and that "[t]he severe consequence of termination was based on the lying even more than the stealing."  Barkyani prepared a typed statement for the Human Resources Department dated May 9, 2006, stating that DeNardi was "terminated for falsifying time records for another employee."

DeNardi affirms that she did not lie and that this statement is a pretext for discrimination because of Barkyani's mistaken perception that her cancer treatment disabled her. According to DeNardi, defendants fired her because they regarded her as substantially limited in the major life activity of working.

## DISCUSSION

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A genuine issue of material fact exists when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In deciding whether a genuine issue of fact exists, the court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)(citing Anderson, 477 U.S. at 255).  Summary judgment is appropriate when "the nonmoving party fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "[A] plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)(citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

**I.   Discrimination under the ADA**

In a disability discrimination case, courts apply the three-step burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  Id. at 802.  The burden of production then shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action.  Id.  "If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of … discrimination."  Holcomb, 521 F.3d at 138.  Plaintiff need only show that discrimination was "at least one of the motivating factors" in the employer's decision. Id. (internal citations omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  At the summary judgment stage, this means that the plaintiff "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as

to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

DeNardi argues that she has provided sufficient evidence to make out a prima facie case of perceived disability discrimination under the ADA.  To establish a prima facie case, a plaintiff must show that (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she is qualified to perform the essential functions of the position with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001)(citations omitted). There is no dispute that DeNardi can meet elements 1 and 3 of her prima facie case.  The only question presented by this motion is whether DeNardi has provided sufficient evidence of elements 2 and 4.

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more ... major life activity" or "being regarded as having such an impairment." 42 U.S.C. § 12102(2).  An employee can be regarded as disabled under the statute if:  1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." Sutton v. United Air Lines, 527 U.S. 471, 489 (1999).  In DeNardi's case, she alleges that ISS/DRA incorrectly regarded her as having a mental

impairment caused by her cancer treatment that substantially limits her in the major life activity of working.

As to element four, DeNardi need only show that she was terminated under circumstances giving rise to an inference of discriminatory intent. Debidat v. Marriott Int'l, Inc., 580 F.Supp.2d 300, 305 (S.D.N.Y. 2008)(citing Holcomb, 521 F.3d at 138). The prima facie case raises an inference of discrimination only because it is presumed that the adverse action, if otherwise unexplained, is more likely than not based on the consideration of impermissible factors. Debidat, 580 F.Supp.2d at 305 (citations ommitted).

## II. Plaintiff's Prima Facie Case

### A. There is Sufficient Evidence for a Reasonable Jury to Conclude that ISS/DRA Regarded DeNardi as Disabled

Drawing all inferences in favor of DeNardi, she has presented sufficient evidence to show that DRA/ISS regarded her as substantially limited in the major life activity of working. According to DeNardi's testimony, on one occasion after her return to work, Barkyani accused her of forgetting to do something and asked her if the "chemo was affecting [her] brain." This statement indicates that defendants formed an erroneous belief that DeNardi would be unable to perform as she has previously done because of her chemotherapy treatment.

In addition, according to DeNardi, Barkyani treated her differently upon her return to work from cancer treatment by excluding her from meetings and taking work away from her. DeNardi was also reassigned to the Cerner Interface, which she viewed as a type of demotion.  These actions also suggest that defendants questioned DeNardi's ability to work after her surgery.

Finally, DeNardi testified that Barkyani began excluding her from social gatherings after her cancer treatment and that Mark Newton, the manager with responsibility for hiring and firing decisions, began ignoring her in the hallways.  If believed, this testimony is illustrative of a significant change in the way defendants treated DeNardi after her cancer treatment.

Viewed in a light most favorable to DeNardi, this evidence is sufficient for a reasonable jury to find that defendants believed she was significantly restricted in her ability to work.

**B. There is Sufficient Evidence that DeNardi Was Terminated Because She Was Regarded as Disabled**

DeNardi has also proffered sufficient admissible evidence to show that she was terminated because her employer regarded her as unable to perform a broad range of jobs, meeting the fourth element of her prima facie case.  DeNardi was an employee of DRA/ISS for six years before she took a two month leave of

absence to be treated for cancer.  DeNardi's annual performance reviews consistently rated all aspects of her work as "very good" or "outstanding."  Yet five months after her return from cancer treatment, DeNardi was fired.

Defendants argue that DeNardi was terminated because she clocked out her daughter.  Barkyani initially confronted DeNardi about clocking out Heather and then reported her version of DeNardi's behavior to Mark Newton.  Based entirely on Barkyani's report, Newton proceeded to terminate DeNardi.

Viewing all of the evidence in a light most favorable to DeNardi, the circumstances surrounding DeNardi's termination, coupled with the change in the way defendants treated her and her changed job responsibilities, are evidence supporting an inference that Newton, in conjunction with Barkyani, decided to terminate her because of an incorrect belief that she was substantially limited in her ability to work.

**III.  A Genuine Dispute of Fact Exists as To Whether Defendants' Reason for Terminating DeNardi is Pretextual**

Defendants argue that they have rebutted DeNardi's prima facie case of discrimination by providing a "legitimate, non-discriminatory reason" for DeNardi's termination:  improperly clocking out another employee, which DeNardi admits doing. Newton's email to his supervisors specifically states that this is why DeNardi was fired, as do Barkyani's notes.

However, DeNardi affirms that clocking one another out was a common practice in the workplace and was not discouraged or prohibited.  If true, this is strong evidence that defendants' reason for firing her is pretextual.  DeNardi also affirms that on one occasion, Barkyani herself called and asked DeNardi to clock her out because she had forgotten to do so.

To rebut DeNardi's assertion that clocking other employees out was an accepted course of conduct, defendants have produced a "Security and Confidentiality Agreement" signed by DeNardi on April 1, 2003, in which DeNardi agreed not to log on to any of the company's computer systems using a password other than her own.

Thus there is a genuine issue of material fact as to whether clocking out other employees is a serious offense at DRA/ISS. This raises a genuine issue of material fact as to whether defendants' asserted reason for firing DeNardi is pretextual.

**IV.** **Defendants' Motion for Summary Judgment That They Have Not Violated New York Human Rights Law Is Also Denied**

The burdens of proof in employment discrimination cases under New York law are governed by the same standards as those that apply in federal civil rights cases, including the ADA. Sogg v. Am. Airlines, Inc., 603 N.Y.S.2d 21, 23 (N.Y. App. Div. 1993); Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992). The only major difference in the analysis of disability discrimination claims under NYHRL and the ADA is that the definition of disability under the New York State Executive Law is broader than the ADA definition, in that it does not require a showing that the disability substantially limits a major life activity.  Giordano, 274 F.3d at 753.  Therefore, the same analysis of plaintiff's prima facie case applies to both her ADA and NYHRL claims.  In addition, the same genuine issue of material fact exists as to whether defendants' reason for firing DeNardi is pretextual.

**V.** **Defendant DRA's Motion For Summary Judgment That DeNardi Fails to Establish a Prima Facie Case Against DRA is Denied**

Defendant DRA moves for summary judgment that it did not employ DeNardi and therefore DeNardi cannot make out a prima facie case of discrimination against it.  The term "employer," as it is used in Title VII and related discrimination statutes, is sufficiently broad to encompass any party who significantly

16

affects the access of any individual to employment opportunities. Spirt v. Teachers Ins. & Annuity Assoc., 691 F.2d 1054, 1063 (2d Cir. 1982), judgment vacated on other grounds, 463 U.S. 1223, 103 S. Ct. 3565, 77 L. Ed. 2d 1406 (1983).  This is true regardless of whether that party may technically be described as an "employer" of an aggrieved individual as that term has generally been defined at common law.  Id.

Here, DeNardi alleges that operations of ISS and DRA are so interrelated that they represent a single employer.  In order to determine whether two entities constitute a single employer, courts apply a four-part test, examining evidence of 1) interrelation of operations, 2) centralized control of labor relations, 3) common management and 4) common ownership or financial control.  Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240-41 (2d Cir. 1995).  "'Courts applying this four-part standard in Title VII and related cases have focused on the second factor: centralized control of labor relations.'"  Id. at 1240 (citing Travino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir. 1983).  Whether centralized control of labor relations exists in a particular case is often determined by asking what entity made the final decisions regarding employment matters related to the person claiming discrimination.  Id.

Applying the four factor test to DRA and ISS, DRA is not entitled to summary judgment because, on the current record,

there is evidence as to all four factors that weigh against it. Most significantly, DRA and ISS have common management, i.e. Mark Newton and Joseph Chiseri, and it was Mark Newton who made the final decision to terminate DeNardi.  In addition, DRA appears to have maintained some control over labor relations at ISS because the employment forms which DeNardi signed, including an employment application and a confidentiality statement, were entitled "DRA Imaging, P.C./Imaging Support Services, LLC."  A new employee benefit checklist that was completed on DeNardi's first day of work as well as the Employee Handbook she was given also both state "DRA Imaging, P.C./Imaging Support Services, LLC."  The fact that DRA's name appears on all of these documents indicates that they may have exercised control over these aspects of labor relations at ISS.

There is also evidence of interrelation of operations between DRA and ISS, because ISS is run by an "operating committee" consisting of four members, two of whom are appointed by DRA.  In addition, DRA and ISS operate out of the same facility.

Finally, because ISS is a limited liability company and DRA is one of its two members, it is highly likely that there is common ownership of the two companies, although neither party has presented evidence of defendants' ownership.

    Thus there is sufficient evidence in the record to
preclude summary judgment on the issue of whether DRA and ISS
employed DeNardi together as a single employer.

**CONCLUSION**

    For the foregoing reasons, Defendants' motion for summary
judgment is denied.


SO ORDERED.

Date:     New York, New York
          March 25, 2009


                          S/_____
                               MIRIAM GOLDMAN CEDARBAUM
                               United States District Judge